IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

RODRIGO HERNANDEZ, §
             Petitioner, §
§
§
v. § No. SA-08-CA-391-OG
§ **Death Penalty Case**
§
NATHANIEL QUARTERMAN, §
Director, Texas Department of §
Criminal Justice, Correctional §
Institutions Division, §
             Respondent. §

**RESPONDENT QUARTERMAN'S ANSWER WITH BRIEF IN SUPPORT**

Petitioner, Rodrigo Hernandez,[1] was convicted by a jury and sentenced to

death in a Texas court for murdering Susan Verstegen while in the course of

committing sexual assault and/or kidnapping.   Having spent several years

pursuing his claims in state court, Hernandez now challenges the validity of his

conviction and sentence in this Court pursuant to 28 U.S.C. § 2254.   However,

Hernandez fails to demonstrate that he is entitled to relief.   He does not show

that the state courts unreasonably applied clearly-established federal law; nor

does he overcome the state court's factual findings with clear and convincing

---

[1]       Respondent Nathaniel Quarterman will be referred to as "the Director."

evidence.  For these reasons, Hernandez's bid for federal habeas relief should be denied.[2]

## PETITIONER'S ALLEGATIONS

Hernandez alleges that he did not receive effective assistance of counsel because:

(1)  his retained attorney did not call Hernandez to testify at the hearing to suppress his confession and also did not correctly understand the governing law;

(2)  his subsequent appointed attorneys did not object to the prosecution's closing argument concerning the cause of death;

(3)  his appointed attorneys did not object to a purportedly misleading question by the prosecution nor did they seek to clarify the witness's answer through cross-examination; and

(4)  his appointed attorneys did not argue at punishment that "residual doubt" mitigated against the imposition of the death penalty.

*See generally* Petition.

Hernandez also generally argues that the state court's findings of fact and conclusions of law on state habeas review should not be entitled to deference because the state habeas court adopted verbatim the State's proposed findings of fact and conclusions of law.

---

[2]    The Director further denies all allegations of fact made by Hernandez except those supported by the record and those specifically admitted herein.

## STATEMENT OF THE CASE

In March 2004, Hernandez was convicted and sentenced to death in the 290th Judicial District of Bexar County, Texas, for the murder of Susan Verstegen, committed while in the course of sexually assaulting and/or kidnapping Verstegen.[3]  3 CR[4] 482.  Hernandez appealed to the Texas Court of Criminal Appeals, which affirmed in a unpublished opinion.  *Hernandez v. State,* No. 74,931, slip op. (Tex. Crim. App. Feb. 15, 2006) (unpublished).  The United States Supreme Court denied Hernandez's petition for a writ of certiorari.  *Hernandez v. State*, 549 U.S. 875 (2006).

While his direct appeal was pending, Hernandez filed a state application for a post-conviction writ of habeas corpus.  SHCR at 1-38.  The trial court held an evidentiary hearing and made findings and conclusions, and the Court of Criminal Appeals entered an order adopting the trial court's findings and

---

[3]     The indictment listed the potential aggravating factors in two separate paragraphs.  The jury was instructed on both sexual assault and kidnapping, but the verdict form does not indicate under which theory Hernandez was found guilty.  3 CR 462-478.

[4]     The Director has submitted Hernandez's state court records under separate cover.  "CR" refers to the Clerk's Record of pleadings and documents filed during trial.  "RR" refers to the Reporter's Record of the transcribed state trial proceedings.  "SHCR" refers to Clerk's Record of pleadings and documents filed during state habeas review.  "SHRR" refers to the Reporter's Record of transcribed state habeas proceedings.  All references are preceded by volume number and followed by page number where applicable.  "DE" refers to entries on this Court's electronic docket sheet, available on PACER.

conclusions and denying the writ.  *Ex parte Hernandez*, No. 69,470-01 (Tex.

Crim. App. Apr. 30, 2008) ("Order") (unpublished).  Hernandez timely filed his

federal petition on April 22, 2009.  DE 15.  The instant proceeding followed.

## STATEMENT OF FACTS

The Court of Criminal Appeals summarized the facts of the crime and

those relating to punishment its opinion affirming Hernandez's conviction as

follows:

> The record reflects that in the early morning hours of February 18, 1994, [Verstegen] was re-stocking snack products at a San Antonio grocery store from the storage bin in back of the store. While working at the storage bin, [Verstegen] was attacked, sexually assaulted, and strangled by [Hernandez].  The offense remained unsolved until 2002 when the results of DNA testing of evidence that had been collected from the crime scene, and that had been entered into a national database, matched the results of DNA testing on a sample that had been collected from [Hernandez] by the State of Michigan and entered into the same national database. After the reported match, another sample from [Hernandez] was tested, and the DNA pattern was found to match the DNA pattern from the sample collected from the crime scene.  [Hernandez's] written statement, which detailed his actions in attacking, sexually assaulting and killing [Verstegen], was also introduced into evidence.
>
> The record also reflects that [Hernandez] had been convicted of multiple criminal offenses in Michigan. In 1992, [Hernandez] had been placed on probation for burglarizing a sporting goods store; however, he had committed numerous violations of the conditions of that probation. As a "youthful offender" facing sentencing for his first felony, he had been granted probation for burglarizing a home, but did not successfully complete the probation and was sentenced

to jail.[5]  He had also been convicted of felony assault with intent to do great bodily harm, indecent exposure, and misdemeanor malicious destruction of property and engaging in an illegal gambling business.  A former high-school girlfriend testified that [Hernandez] had assaulted her.

At trial, [Hernandez] presented testimony from a court-appointed psychiatrist and from a licensed social worker.  The psychiatrist testified about pervasive conditions during [Hernandez's] upbringing, including social conflicts and discord, substance abuse, incarceration of family members, and mental illness.  He also testified about environmental risk factors that [Hernandez] faced.  The psychiatrist pointed out that his CT scan of [Hernandez's] head revealed the presence of a bullet in the left frontal bone of his skull, but conceded that the injury had occurred after this offense.  He also pointed out that [Hernandez] had been twenty years old in 1994 and was thirty at the time of trial, and offered his opinion that there had been some maturation and some indication that [Hernandez's] behavior had become less anti-social.  He also noted that [Hernandez's] abuse of multiple substances had ended and was not likely to recur in an incarcerated setting and that the two rule violations that [Hernandez] had committed while incarcerated had been minor and had not disrupted the penal facility or in any way created violence.

[Hernandez] also presented testimony from a licensed social worker who had prepared a social report.  Her testimony was based upon interviews with [Hernandez] and his family members and a review of [Hernandez's] school, jail, and prison records.  The social worker opined that [Hernandez] does well in a highly structured setting, such as incarceration.  The state did not present psychiatric or psychological testimony.

*Hernandez v. State,* slip op. at 2-3.

_____

[5]     The record reflects that this offense occurred in July of 1990, a few weeks after [Hernandez] had turned seventeen years old. [footnote in original under different number]

## BRIEF IN SUPPORT

### I.    Standard of Review

This petition is subject to review under the amendments to the federal habeas corpus statutes embodied in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Williams v. Cain*, 125 F.3d 269, 274 (5th Cir. 1997).  Under the AEDPA, "[t]his Court may not issue a writ of habeas corpus for a defendant convicted under a state judgment unless the adjudication of the claim by the state court '(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.'" *Riddle v. Cockrell*, 288 F.3d 713, 716 (5th Cir. 2002) (quoting 28 U.S.C. § 2254(d)(1)-(2) (West 2002)).

The Supreme Court has explained that a state court decision is "contrary" to established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Court's] cases," or confronts facts that are "materially indistinguishable" from a relevant Supreme Court precedent, yet reaches an opposite result.  *(Terry) Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *Hernandez v. Johnson*, 248 F.3d 344, 346 (5th Cir. 2001).  Alternatively,

a state court "unreasonably applies" clearly established federal law if it correctly identifies the governing precedent from the Supreme Court's precedents but unreasonably applies it to the facts of a particular case. *Williams,* 529 U.S. at 407-09; *Hernandez*, 248 F.3d at 346.

A federal habeas court's inquiry into unreasonableness should be objective rather than subjective, and a court should not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. *Williams*, 529 U.S. at 409-11; *Tucker v. Johnson*, 242 F.3d 617, 620-21 (5th Cir. 2001). Rather, federal habeas relief is only merited where the state court decision is both incorrect and objectively unreasonable. *Williams*, 529 U.S. at 411; *Martin v. Cain*, 246 F.3d 471, 476 (5th Cir. 2001). In other words, habeas relief is inappropriate when a state court, at a minimum, reaches a "satisfactory conclusion." *Williams,* 529 U.S. at 410-11 (citing *Wright v. West*, 505 U.S. 277, 287 (1992)).

Further, the Fifth Circuit has held that it is the state court's "ultimate decision" that is to be tested for unreasonableness, "not every jot of its reasoning." *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001); *see Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (holding that a federal court's "focus on the 'unreasonable application' test under Section 2254(d) should

-7-

be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence"); *Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) (applying AEDPA deferential standard of review where state habeas writ was denied without explanation).  Indeed, state courts are presumed to know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).  And, even where the state court fails to cite to applicable Supreme Court precedent or is unaware of such precedent, the AEDPA deferential standard of review nevertheless applies "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]." *Early v. Packer*, 537 U.S. 3,  8 (2002).

Moreover, pre-AEDPA precedent forecloses habeas relief if a claim (1) is procedurally barred as a consequence of a failure to comply with state procedural rules, *Coleman v. Thompson*, 501 U.S. 722 (1991); (2) seeks retroactive application of a new rule of law to a conviction that was final before the rule was announced, *Teague v. Lane*, 489 U.S. 288 (1989); or (3) asserts trial error that, although of constitutional magnitude, did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation omitted).

**II.    The State Habeas Court's Findings and Conclusions Are Entitled to AEDPA Deference Even If the State Habeas Court Adopted the State's Proposed Findings Verbatim.**

Hernandez argues that the state habeas court's findings of fact and conclusions of law are not entitled to deference because the state habeas court adopted the State's proposed findings and conclusions verbatim.  Petition at 33-38.  However, assuming arguendo that Hernandez is correct and the habeas court did adopt verbatim all fifty-three pages of findings submitted by the State, the Fifth Circuit has already considered and rejected this exact claim.  *See Hudson v. Quarterman*, 273 Fed. Appx. 331, 334 (5th Cir. 2008) (unpublished) (rejecting argument that state court findings are not entitled to deference where the state court adopted the state's proposed findings and conclusions verbatim); *see also Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999) (rejecting due process challenge to state habeas court's verbatim adoption of district attorney's proposed findings of fact and conclusions of law only three hours after they were filed with court); *James v. Collins*, 987 F.2d 1116, 1122-23 (5th Cir. 1993) (rejecting pre-AEDPA challenge to according deference to habeas findings that Texas court adopted verbatim).

The Supreme Court has pointedly instructed federal courts that they "have no power to tell state courts how they must write their opinions." *Coleman*, 501 U.S. at 739. If federal courts are to infer that an unconscionable breakdown

occurred because the state habeas court merely adopted the proposed findings of fact and conclusions of law advanced by the State (rather than drafting its own identical or nearly identical document), not only would this reflect doubt regarding the capabilities of the Texas court as a fair and competent forum for the adjudication of federal constitutional rights, but it would also place the federal courts in the position of dictating to the state courts that they must issue opinions in a particular format lest they be "second guessed" by the federal courts.

Furthermore, Hernandez has made no showing that the state habeas court failed to independently consider and evaluate the State's proposed findings and conclusions before adopting them as its own. The record reflects that the state habeas court conducted a hearing at which Hernandez was allowed to examine witnesses and present evidence in support of his claims. *See generally* SHRR. Likewise, the habeas court invited both parties to submit proposed findings and conclusions, even though it appears that only the State so. *See* SHRR 35; *see generally* SHCR. Consequently, although the state habeas court ultimately adopted the State's proposed findings and conclusions, it is clear that the state habeas court fully and fairly considered Hernandez's claims. Thus, Hernandez's argument has no basis in the record and must be rejected.

**III.    Hernandez Has Failed to Show that He Received Ineffective Assistance of Counsel at the Hearing to Suppress His Confession.**

Hernandez claims that he received ineffective assistance of counsel at his suppression hearing because his retained attorney: (1) did not put him on the stand, and (2) purportedly misunderstood the governing law.  Petition at 12-22.  The state habeas court evaluated this claim and determined that Hernandez had failed to show that counsel performed defectively at the suppression hearing, and even if counsel had performed defectively, Hernandez was not prejudiced.  SHCR 240-41.  As shown below, Hernandez has not shown that this decision was an unreasonable application of the law to the facts or contrary to clearly-established Supreme Court precedent.  Accordingly, this claim should be denied.

**A.    Background**

The state habeas set forth the circumstances of Hernandez's confession as follows:

> In August of 2002, over eight years after the commission of the offense, Michigan State Police notified San Antonio authorities that [Hernandez's] DNA profile, which they had placed into the CODIS system, had matched the unknown sample DNA profile from the Susan Verstegen homicide case.  San Antonio Police Detective George Saidler, of the cold case squad, learned that [Hernandez] had worked for H.E.B. in February 1994.  [19 RR 67-69; 20 RR 43.]  In fact, H.E.B. employment records showed that [Hernandez] worked as a stocker at H.E.B. No. 29, at I.H. 10 and Wurzbach, in San Antonio, and was terminated on February 18, 1994.  [19 RR 110-113.]  Det. Saidler asked Detective Jack VanderWal, of the Michigan State Police, to interview [Hernandez] regarding any affiliation [Hernandez] might have had with

[Verstegen]. [19 RR 16-21, 70, 71.]  Det. VanderWal was given background information on the crime, the CODIS match of [Hernandez's] DNA and that [Hernandez] was in San Antonio at the time of the commission of the offense. [19 RR 21.]  Det. VanderWal found that [Hernandez] was living with Rebecca Hernandez, [Hernandez's] sister, in Grand Rapids. [19 RR 17, 18.]

Det. VanderWal interviewed [Hernandez] in the State of Michigan Building, Grand Rapids, Michigan, on September 17, 2002.  Det. VanderWal was wearing a tape recording device or in police jargon, a "wire."  He read [Hernandez] his rights and asked if [Hernandez] would speak to him regarding a woman he may have known when [Hernandez] was working at H.E.B. in 1993-1994.  [Hernandez] was shown Susan Verstegen's photograph, State's Exhibit No. 4.  [Hernandez] denied knowing her or of having any association, affiliation or contact with [Verstegen].  [Hernandez] denied having dated her and denied having sex with her. [19 RR 22-30; State's Exhibit No. 71 (transcript of 9/17/02 interview of Hernandez by Det. VanderWal.]    Following this interview, [Hernandez] was arrested pursuant to a warrant.  Blood and hair samples, and DNA swabs, were taken from [Hernandez] pursuant to a search warrant, State's Exhibit No. 1.  They were then sealed, packaged and forwarded to San Antonio on September 18, 2002. [19 RR 32-34; State's Exhibit No. 1.]

Det. Saidler traveled to Michigan and on September 18, 2002, he and Det. VanderWal went to the Kent County Jail to interview [Hernandez].  In the interview room, [Hernandez's] rights were read to him and agreed to waive his rights.  After [Hernandez] went over again what he had told Det. VanderWal the day before, Det. Saidler told [Hernandez] that they had DNA evidence against him and that [Hernandez] was lying to the officers.  After a few seconds, [Hernandez] asked if he could speak with Det. Saidler alone.  Det. VanderWal left the room.  [Hernandez] then claimed that he had lied to Det. VanderWal and, in fact, that he, [Hernandez], had known [Verstegen] and had dated her.  Det. Saidler stopped [Hernandez] and told him that [Hernandez] should not assume that all the evidence the police had in the case regarding DNA was of a sexual nature.  [Hernandez] then got very nervous, began crying and said, "I never meant to kill her." [19 RR

-12-

34-36, 72-77.]

        After again being warned of his rights, [Hernandez] then
gave a written statement, a copy of which was introduced into
evidence over defense objections, as State's Exhibit No. 73.  In this
statement, [Hernandez] states that in February 1994, sometime
after midnight, he was shopping at an H.E.B. store, but it was not
the one that he worked at.  While in the store, he noticed a girl
coming out of the store.  He drove around to the back of the store
and saw this same woman.  [Hernandez] states the he had been
smoking weed and drinking beer and mixed drinks and did not
realize what he was doing.  He got out of his car and spoke to the
woman.  Her car was parked in front of a shed and was unlocked.
[Hernandez] again states that he did not know what he was doing,
but that he suddenly grabbed her and pulled her into the car.
[Verstegen] was struggling and he put both his hands around her
neck to hold her down.  He pulled off her pants.  He unzipped his
pants and had sex with [Verstegen].  He ejaculated and when he
did, he realized that [Verstegen] was not breathing.  [Hernandez]
stated that he panicked and drove off with her in the car.  He drove
a short distance and stopped at what he thought was a park.  At
this location, [Hernandez] put [Verstegen] in a trashcan.  He could
not remember if he moved the can or not.  He then drove off.  While
driving, he stopped and removed the T-tops from the car because it
was warm.  He left the T-tops on the side of the road.  He then
dropped the car off by the side of the road.  [Hernandez] than
walked back to his car.  [Hernandez] did not go back to work.
[Hernandez] claimed that he had not seen [Verstegen] before
despite being informed that she had worked at the same H.E.B.
store that [Hernandez] had worked at.  [Hernandez] stated that he
had two daughters and would not have done this if it were not for
drugs and beer.  [Hernandez] stated that he had never done
anything like that before or since.  [Hernandez] asked Det. Saidler
to write this because he was shaking too much to write it himself.
[Hernandez] stated that he was sorry and wished it were him
instead of her.[] [19 RR 77-83; State's Exhibit No. 73.]

SHCR 209-12.

        The trial court originally appointed attorneys Trevino and Granados to

represent Hernandez.  CR 2, 5.  Subsequently, attorney Perry D. Cortese was retained by his Hernandez's family to represent him.  SHRR 4.  Cortese met with the court-appointed attorneys at their office and reviewed documents that they had previously filed in the case.  *Id.* at 5.  Cortese also reviewed the State's file and began investigating the crime.  *Id.* at 5.  But Hernandez's financing fell through, and the case was eventually returned to the court-appointed attorneys. *Id.* at 11.  The only adversarial proceeding that Cortese handled was the pre-trial motion to suppress.  *Id.* at 5.

At the suppression hearing, the State called two witnesses—former Michigan State Police Officer Jack VanderWal and San Antonio Police Detective George Saidler.  2 RR 21, 55.  Both officers testified as to the circumstances surrounding the interviews with Hernandez, the obtaining of a search warrant, and the taking of Hernandez's statements, and the required constitutional warnings given to Hernandez.  *Id.* at 25-44, 55-72, 81.  Cortese cross-examined each officer on the various circumstances related to these issues.  *Id.* at 44-54, 72-80, 82.

At the conclusion of the hearing, the trial court found that Hernandez's confession was freely and voluntarily given, without any threats, coercion, or promises made, and after Hernandez had received all the required warnings, and in compliance with Texas Code Criminal Procedure Article 38.22.  2 RR 89.

At the hearing conducted by the state habeas court, Cortese testified that he believed that the confession had to have been taken in compliance with Michigan law.  SHRR 5-6.  Corteste explained that Michigan law required that a confession be audiotaped or videotaped and then sent to a jury for evaluation. *Id.* at 6, 18.  Cortese testified that the only reason for the hearing on the motion to suppress was his belief that if he could convince the trial court that Michigan law should apply, the confession would have to be suppressed.  *Id.* at 11-14. Although Cortese had some caselaw supporting this belief, he did not present it to the court and believed that he should have.  *Id.* at 6-7, 15.

Cortese also considered having Hernandez testify at the suppression hearing because Hernandez claimed that he had signed a blank pre-printed form, and the police had filled in the blank space with his confession.  Moreover, Hernandez had informed Cortese that the initials on the confession were not his, and Cortese believed that the initials differed significantly from Hernandez's handwriting.[6]  *Id.* at 13, 16.  Although Cortese did not disbelieve Hernandez, he knew that if he called Hernandez to the stand, it would end up being Hernandez's word against a police officer's word.  *Id.* at 16.  Hernandez was extremely nervous and frightened, and Mr. Cortese did not feel like it would be

---

[6]    Cortese neither consulted a handwriting expert nor did he have Hernandez testify regarding the initials.  SHRR 13.

beneficial or effective to put Hernandez on the stand.  SHRR 16.  On the other hand, Cortese believed the police officer was an experienced witness and would be very adept at testifying.  Cortese also knew of Hernandez's lengthy prior criminal record from Michigan, and that if he called Hernandez to testify, the State could have used that criminal record to impeach Hernandez's credibility. *Id.* at 17.  Consequently, he attempted to challenge the factual basis of the confession through his questioning of the police.  SHRR 7-8.  Regardless of the outcome of this attempt to have the confession suppressed as a violation of Michigan law or as involuntarily given, Cortese knew that under Texas law, he could re-litigate the voluntariness of the confession before the jury. *Id.* at 17-18. He also knew that the jury would be instructed that if they determined that the confession was involuntary the jury could not use it.  *Id.* at 17-18.  Cortese testified that if he had continued on the case, that was going to be his next strategy.  *Id.* at 16-18.

   **B.    Standard of Review**

   The familiar two-prong standard by which a claim of ineffective assistance of counsel is weighed is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  That is, to establish that counsel performed ineffectively, Hernandez must show both that his attorney's performance was deficient and the deficient performance prejudiced his defense.  *Id.* at 687.  Furthermore, because a

convicted defendant must satisfy both prongs of the *Strickland* test, a failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong.  *Id.* at 697.

In order to establish that counsel's performance was constitutionally deficient, a convicted defendant must show that trial counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 687.  In so doing, a convicted defendant must overcome a strong presumption that trial counsel's conduct fell within a wide range of reasonable professional assistance, and every effort must be made to eliminate the "distorting effect of hindsight." *Id.* at 689.

Furthermore, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Id.* at 692.  In order to establish that he has sustained prejudice, Hernandez "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694.  A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id.*  A mere allegation of prejudice is not sufficient to satisfy the prejudice prong of *Strickland*; rather, Hernandez must "affirmatively prove" prejudice. *Id.* at 693.

Moreover, when a petitioner seeks a writ of habeas corpus based on

ineffective assistance:

> [i]t bears repeating that the test for federal habeas purposes is not whether [petitioner] made that showing.  Instead, the test is whether the state court's decision—that [petitioner] did not make the *Strickland* showing—was contrary to, or an unreasonable application of, the standards, provided by the clearly established federal law (*Strickland*), for succeeding on his IAC claim.

*Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003).  Accordingly, to succeed in this Court on an ineffective-assistance-of-counsel claim, Hernandez must at a minimum show that the state habeas court's decision was contrary to, or an unreasonable application of, the standards provided by the clearly-established federal law (*i.e.*, *Strickland*).

### C. Counsel did not perform deficiently at the suppression hearing. But even assuming that he did, no prejudice accrued as a result.

The state court entered the following findings of fact with respect to this claim:

> 2.    [][T]he court finds that [Hernandez] produced no evidence [Cortese's] legal conduct at the hearing on the motion to suppress was so deficient as to satisfy the first prong of *Strickland v. Washington*, supra, nor is such an allegation supported after reviewing the record of the motion to suppress hearing. [2 RR.]

> 3.    At the writ hearing, the State argued that [Hernandez's] written confession was admissible under Texas law, as previously found by the court, and [Hernandez] presented no evidence or argument to the contrary. [SHRR 32-34.]

> 4.    The voluntariness of [Hernandez's] written confession could have been relitigated at trial by his trial attorneys, [Granados] and [Trevino], and the jury could have been instructed accordingly, if

[Granados] and [Trevino] had decided to pursue that strategy. [*See*] Tex. Code Crim. Proc. Ann. art. 38.22, Sec. 7 (Vernon 2005).

SHCR 238-39.

The state court also entered the following conclusion of law:

1.      [Hernandez's] written confession was taken in compliance with federal constitutional law and in compliance with [Texas Code Criminal Procedure Article 38.22, Section 2]. Since [Hernandez's] written confession was taken in compliance with [[Texas Code Criminal Procedure Article 38.22, Section 2], it was admissible under [Texas Code Criminal Procedure Article 38.22, Section 8 (1)], regardless of any deficiencies that may have existed for its admissibility under Michigan law.

SHCR 240.

While Cortese's argument that Michigan law was applicable was ultimately unsuccessful, Hernandez has failed to rebut the strong presumption that trial counsel's conduct fell within a wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689. Moreover, it is clear that Hernandez could not have been prejudiced by counsel's handling of the hearing, since the confession was repeatedly found admissible under Texas law. Even if Cortese had attempted to make a different argument based on voluntariness, the confession would have still been admitted into evidence. Indeed, the state habeas court noted that Hernandez's subsequent court-appointed counsel, despite having the ability to re-litigate the voluntariness issue before the jury, determined not to pursue such a strategy. It is logical to assume that court-

appointed counsel made that decision because they believed that re-litigating the issue would have been fruitless.  Thus, even if the Court finds deficient performance, Hernandez is not entitled to relief on this claim due to a lack of prejudice. *Ramirez v. Dretke*, 398 F.3d 691, 697 (5th Cir. 2005) (reiterating that both prongs of the *Strickland* test must be satisfied in order to be entitled to relief).

As for Hernandez's claim that he should have been put on the stand to contest the voluntariness of the confession, "[c]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what a witness would have testified are largely speculative." *Sayre v. Anderson*, 238 F.3d 631, 635-36 (5th Cir. 2001) (quoting *Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir. 1986)). Allegations that counsel failed to investigate and develop useful evidence are not sufficient to warrant a hearing or relief absent an "affirmative showing of what the missing evidence or testimony would have been" and an explanation "why it would have been likely to make any difference in his trial or sentencing." *Anderson v. Collins*, 18 F.3d 1208, 1220 (5th Cir. 1994). "A prisoner's bald conclusory assertion that supposed . . . witnesses were not called does not serve to 'overcome the strong presumption that his counsel's actions were reasonable.'" *Sayre*, 238 F.3d at 635 (quoting *Marler v. Blackburn*, 777 F.2d 1007, 1010 (5th Cir. 1985)).  Here, Hernandez failed to present an

affidavit or testimony in state court to inform the court what he would have said on the stand.

Furthermore, the presentation of witness testimony is essentially strategy and, thus, within trial counsel's domain. *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985). A petitioner must overcome a strong presumption that his counsel's decision in not calling a particular witness was a strategic one. *Murray v. Maggio, Jr.*, 736 F.2d 279, 282 (5th Cir. 1984). Cortese testified that Hernandez was in no condition to testify and putting hin on the stand would not have been effective. SHRR 16-17. Moreover, as Cortese correctly noted, it would have come down to Hernandez's word against the word of the police officer. *Id.* Given Hernandez's lengthy criminal history, that is a battle that Hernandez would have doubtlessly lost. *Id.*

Accordingly, Hernandez he has not shown that the state court proceedings with respect to his ineffective-assistance-of-counsel claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly-established federal law, as determined by the Supreme Court of the United States, or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *Williams*, 529 U.S. at 402-03; *Childress v. Johnson*, 103 F.3d 1221, 1224-25 (5th Cir. 1997). His claim should be denied.

**IV.   Hernandez Did Not Receive Ineffective of Assistance of Counsel When His Attorneys Did Not Object to the Prosecutor's Closing Argument.**

Hernandez also claims that he was denied effective assistance of counsel because his court-appointed attorneys did not object to the prosecutor's alleged misrepresentation of the forensic pathologist's opinion with respect to how the victim was strangled.  Petition at 22.  According to Hernandez, because Dr. Robert Bux's testimony that Verstegen's strangulation was effected by either a ligature or hands or a combination, the prosecutor's final argument stating that "at least some type of ligature was used—either ligature alone or ligature and hands," was a misrepresentation of Dr. Bux's testimony in the sense that it excluded the possibility that only hands were used.  He further contends that counsel's decision not to object to this alleged misrepresentation allowed the prosecution to successfully argue against the possibility that he had only committed felony murder (as supported by the statement in his confession that he had accidentally strangled the victim with his hands).  The state habeas court held that the argument was proper as a "reasonable deduction from the evidence and a summation of the evidence presented" and thus counsel was not ineffective for failing to object.  SHCR 248.

**A.   Background**

Dr. Bux performed the autopsy on Verstegen.  As a result of the autopsy, Dr. Bux determined that the cause of Verstegen's death was strangulation.  20

RR 27.  According to Dr. Bux, there was a "pattern of something [on the neck],
and that, I think, is probably a ligature of some kind, although it could be done,
I suppose, by hands, although it's hard for me to imagine how these lines would
be produced that way – or it could be a combination with ligature or cloth,
something like that, and then hands placed on top of it.  Any of that will work."
*Id.* at 18.  Dr. Bux testified that one of the ways that someone could sustain the
type of injuries exhibited on Verstegen's neck was from a person holding a
ligature down or pushing a ligature down.  *Id.* at 22.  When specifically asked by
the prosecution what were the two ways in which Verstegen could have been
strangled, Dr. Bux responded: "Either could have been with a ligature or a
ligature plus the hands.  There's no way to specifically tell which occurred
because of the nondescript marks on the neck." *Id.* at 28.  Dr. Bux's testimony
indicated that once Verstegen lost initial consciousness due to the strangulation,
her attacker would have had to have held the ligature on her neck for a
minimum of two additional minutes before she would be unable to regain
consciousness.  20 RR 30, 31.

    During final argument at guilt-innocence, the prosecutor summarized all
the evidence presented to the jury and concluded that it showed an intentional
capital murder.  21 RR 24-41.  During this summary of the evidence, the
prosecutor drew the jury's attention to Verstegen's injuries, including Dr. Bux's

reference to the marks on her neck. *Id.* at 32. The record reflects the prosecutor stated that this meant that ". . . at least some type of ligature was used – either ligature alone or ligature and hands. . . All of these show you without question sexual assault, without question no consent." *Id.* at 32, 33.

### B. An objection would have been futile.

Hernandez claims that counsel should have objected to this portion of the prosecutor's argument. But Hernandez's counsel could not have been constitutionally ineffective if a request or objection would not have been granted. *Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998) (holding that failure to make frivolous objection does not cause counsel's performance to fall below objective standard of reasonableness) (citing *Sones v. Hargett*, 61 F.3d 410, 415 n. 3 (5th Cir. 1995)); *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) (concluding that "counsel is not required to make futile motions or objections").

Here, the state habeas court found that:

1.     The approved general areas of argument are: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to argument of opposing counsel, and (4) plea for law enforcement. [*Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000)]. Counsel is allowed wide latitude without limitation in drawing inferences from the evidence so long as the inferences drawn are reasonable, fair, legitimate, and offered in good faith. *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex. Crim. App. 1988). Alleged argument error must be viewed in the context of the entire argument, keeping in mind the evidence presented. *Mosely v. State*, 686 S.W.2d 180, 183 (Tex. Crim. App. 1985). The court concludes that the prosecutor's argument legitimately constituted a

reasonable deduction from the evidence and a summation of the evidence presented.

2.     Since the prosecutor's argument was proper, there was no need for trial counsel to object, and the failure to object to this argument does not constitute deficient performance by trial counsel under *Strickland*. [*Cf. McFarland v. State*, 845 S.W.2d 824, 844 (Tex. Crim. App. 1992) (failure to object to proper jury argument does not establish deficient performance under *Strickland*)]. Based upon the entire record before this court, [Hernandez] has failed to prove ineffective assistance of counsel under the standards set forth in [*Strickland*] and his fifth claim for relief should be denied

SHCR 248-49.

Indeed, under both federal and state law, the prosecutor was permitted to argue reasonable inferences or deductions from the evidence. *See Dowthitt v. Johnson*, 230 F.3d 733, 755 (5th Cir. 2000) ("We have held that '[i]n the context of closing argument, . . . [the prosecutor is not] prohibited from reciting to the jury those inferences and conclusions she wishes the jury to draw from the evidence so long as those inferences are grounded upon evidence.'" (brackets and ellipsis in original) (quoting *United States v. Munoz*, 150 F.3d 401, 414-15 (5th Cir. 1998))); *Wilson v. State*, 7 S.W.3d 136, 147 (Tex. Crim. App.1999) (holding that prosecutor is permitted to argue "reasonable deductions from the evidence"). Here, Dr. Bux testified that it was most likely that a ligature was used to strangle Verstegen. A reasonable deduction from this testimony is that Hernandez and Verstegen did not have consensual sex, and Hernandez intended

to kill Verstegen.  Consequently, any objection to the prosecutor's closing argument would have been overruled.

With regard to prejudice, Hernandez seems to suggest that the prosecution's argument that he used a ligature to strangle his victim undermined his claim that he did not intend to kill his victim (in his confession Hernandez admitted to putting his hands around the victim's neck during sex but states that he did not realize until after that she had ceased breathing).  But this marginal difference in Hernandez's credibility doubtlessly would have had little effect on the jury's evaluation of his intent.  Whether or not Hernandez ultimately strangled his victim with his hands, a ligature,  or a ligature and his hands, the jury had ample evidence from the cause of death to conclude that Hernandez intended to kill Verstegen.

Accordingly, Hernandez has failed to show that the state habeas court's decision was contrary to, or an unreasonable application of, the standards provided by clearly-established federal law for succeeding on an ineffective-assistance claim.  Therefore, this claim should be denied.

## V.   Hernandez's Attorneys Did Not Act Ineffectively by Not Objecting to a Question by the Prosecutor that Presumed Use of a Ligature Rather than Manual Strangulation.  Likewise, They Were Not Ineffective for not Cross-examining Dr. Bux on this Point.

Hernandez also argues that he was denied effective assistance of counsel when his attorneys did not clarify on cross-examination or otherwise object to a

question by the prosecutor to Dr. Bux, which assumed that a ligature had been

used to strangle the victim rather than solely hands.  *See* Petition at 24-25; *see

also* 20 RR 31.   Hernandez claims that counsel should have objected to the

question or engaged in clarification through cross-examination to show that Dr.

Bux had not ruled out the sole use of the hands as the cause of death.  Petition

at 24-25.  The state habeas court evaluated this claim and made the following

findings of fact:

> 1.      The record reflects that Dr. Bux testified that a ligature or a
> ligature plus hands had been used to strangle [Verstegen].
> Although hands could have been used, it was hard for him to
> imagine how the line marks on her neck would have been produce
> by the mere use of hands.   Dr. Bux believed that a ligature or
> ligature plus hands had been used.  20 RR 17-18, 28.
>
> 2.      In light of Dr. Bux's testimony as to the markings around
> [Verstegen's] neck, the prosecutor's question was a proper question
> and Dr. Bux's response was relevant opinion evidence as to how the
> marks could have been made.
>
> 3.      [Hernandez's] allegations in his third claim for relief are not
> supported by the record evidence and [Hernandez] offered no
> evidence at the writ hearing in support of this claim for relief.

SHCR 249-50.

Based on these findings, the habeas court concluded that Hernandez had

has failed to prove ineffective assistance of counsel and denied his claim.  *Id.* at

250.  As noted above, failure to make a meritless objection does not constitute

ineffective assistance of counsel.  *Green*, 160 F.3d at 1037.  Bux clearly testified

that Verstegen was strangled it was likely that a ligature was used. Consequently, the time required to kill Verstegen in such a fashion was a relevant and germane question to which there was no reasonable objection.  As for Hernandez's contention that counsel should have cross-examined Dr. Bux with regard to his statement in order to confirm that he believed it possible that hands were used, Dr. Bux had already conceded that it was possible that the victim was killed solely by manual strangulation.  Having him repeat this concession would have been of dubious efficacy.  Counsel is not ineffective for failing to present cumulative evidence. *Murray*, 736 F.2d at 282 (failure to call witnesses whose testimony would have amounted to cumulative evidence does not constitute ineffective assistance of counsel).  Consequently, Hernandez cannot show the state court's adjudication of his claim resulted in a decision which was contrary to, or involved an unreasonable interpretation of, clearly-established federal law, as set out by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).  Accordingly, this claim for relief should also be denied.

**VI.  Hernandez Did Not Receive Ineffective Assistance of Counsel at Punishment as a Result of His Attorneys' Strategic Decision Not to Present or Argue a "Residual Doubt" Case.**

    **A.  Hernandez's "residual doubt" claim is actually a meritless cumulative error claim.**

Although he does not acknowledge it, Hernandez's "residual doubt" argument is really a cumulative-error argument.  Petition at 25-33.  In support of his "residual doubt" argument, Hernandez has cited to *Moore v. Johnson*, 194 F.3d 586 (5th Cir. 1999).  But, while the Fifth Circuit noted in *Moore* that, although arguing "residual doubt" was a valid trial technique, *Moore* was "not a residual doubt case."  *Id.* at 618.  Rather, the Fifth Circuit held that counsel was ineffective because of his numerous errors at guilt/innocence and his failure to present mitigating evidence at punishment.  *Id.* at 619-20.  Counsel's guilt/innocence errors, the Fifth Circuit found, prejudiced the outcome of the punishment phase.  Consequently, *Moore* was actually a cumulative-error case.

Thus, Hernandez's case is easily distinguishable from Moore's.  Unlike Moore, Hernandez has failed to show any discrete instances where trial counsel committed error.[7]  "Federal habeas relief is only available for cumulative errors

---

[7]    In addition to the previously addressed errors, Hernandez also contends that there was a lack of eyewitnesses and that the prosecution was relying only on "mere science" and a "three page statement" to convict Hernandez.  Petition at 31.  Consequently, he believes that counsel should have argued that the case against him was "circumstantial."  This contention ignores, of course, the fact that the "three page statement" was a signed confession and the "mere science" was a DNA pattern that did not exclude Hernandez and could only be expected in one and every 5.1 *quadrillion*

that are of a constitutional dimension." *Coble v. Dretke*, 444 F.3d 345, 355 (5th Cir. 2006) (citing *Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir. 1997)).  As discussed above, Hernandez's individual claims are without merit.  Thus, there are no errors to cumulate.  *See Westley v. Hudson*, 83 F.3d 714, 726 (5th Cir. 1996) (holding that "[m]eritless claims or claims that are not prejudicial [or claims that are procedurally barred] cannot be cumulated, regardless of the total number raised") (citation omitted).  Consequently, there is no basis here for relief.

### B.   In any event, counsel made a strategic choice not to argue residual doubt.

The state habeas court rejected this claim on the basis that Hernandez's attorneys had deliberately provided a vehicle for the jury to express any doubts regarding Hernandez's involvement through a lesser-included instruction.

---

southwestern Hispanics.  20 RR 59-61.  Clearly, no jury would have ever lent credence to such an argument.

Finally, Hernandez also states that counsel should have presented expert testimony that the bite marks on the victim did not match the dental casts that detectives took from him.  Petition at 31-33.  But Hernandez provides absolutely no evidence to show that this is the case.  As noted earlier, Hernandez is required to make an "affirmative showing of what the missing evidence or testimony would have been" and an explanation "why it would have been likely to make any difference in his trial or sentencing."  *Anderson*, 18 F.3d at 1220.  Again, "[a] prisoner's bald conclusory assertion that supposed . . . witnesses were not called does not serve to 'overcome the strong presumption that his counsel's actions were reasonable.'"  *Sayre*, 238 F.3d at 635.  Without an affidavit or testimony from an expert opining that the bite marks on the victims were not from Hernandez, this claim does not constitute a viable ground for relief.

SHCR 248-52.  When the jury failed to deliver a verdict on felony-murder, the defense decided that arguing "residual doubt" would be futile and opted to concentrate its efforts on showing that Hernandez would not be a future danger.

*Id.*  The habeas court based its conclusions on the following findings of fact:

> 1.    A review of all the evidence, including [Hernandez's] confession as well as his connection to the offense through his DNA, revealed a very strong case against him.   Through their investigation, trial counsel were well aware of [Hernandez's] background and the strength of the State's evidence against [Hernandez].
>
> 2.    Trial counsel used [Hernandez's] statement in his confession of his lack of intent to kill [Verstegen] to pursue a strategy at the guilt-innocence phase that [Hernandez] was guilty only of the lesser-included offense of felony murder.  Trial counsel requested and received a charge to the jury on the lesser-included offense of felony murder. [20 RR 80, 81, 85; 3 CR 468-470.]  The Defense presented argument to the jury on the issue of the lesser-included offense of felony murder.  [21 RR 11-15, 20-24.]
>
> 3.    After the jury rejected the lesser-included offense of felony murder and found [Hernandez] guilty of capital murder, trial counsel shifted their strategy to one of saving [Hernandez's] life by presenting expert testimony that [Hernandez] would not be a future danger if confined in prison.  Based upon the record evidence at trial, the court finds that [Hernandez's] prior periods of confinement provided trial counsel with not only an historical factual basis upon which to present this punishment strategy but also allowed for counsel to use expert testimony in support of this strategy. [Mario Trevino], co-counsel with [Granados], urged in his final argument on punishment that the evidence established that [Hernandez] would not be a future danger in the prison environment.  [23 RR 131-132.]  The court finds that trial counsel's decision in this regard constituted a strategic decision made by counsel after thorough investigation of the law and facts relevant to plausible options.

4.    The court finds that [Hernandez] has failed to make a record showing that counsel's strategy on the punishment phase constituted ineffective assistance under *Strickland v. Washington*, supra.   The jury had already effectively rejected any "residual doubt" argument by finding [Hernandez] guilty of capital murder and by not finding him guilty of the lesser-included offense of felony murder.

5.    [Hernandez] has failed to show from the record evidence any evidence that could have or would have justified a "residual doubt" approach by his trial counsel during the punishment phase of trial. [Hernandez] has also failed to show that his counsel's decision to base the punishment strategy upon [Hernandez's] non-violent behavior during prior incarcerations to prove he would not be a future threat in prison constituted ineffective assistance under *Strickland v. Washington*, supra.

SHCR 248-50.

The Supreme Court has noted that "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690-691.  Furthermore, "[b]ecause advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment." *Id.* at 681. Such "[t]actical and strategical decisions of counsel 'if based on informed and reasoned practical judgment' will not be second-guessed.'" *Ransom v. Johnson*, 126 F.3d 716, 721 (5th Cir. 1997) (citing *McCoy v. Lynaugh*, 874 F.2d 954, 964 (5th Cir. 1989) (quoting *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985)). A "conscious and informed decision on trial tactics and strategy is not a

-32-

permissible basis for a claim of ineffective assistance of counsel unless the strategy was so poor that it robbed the defendant of any opportunity to get a fair trial." *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002) (internal quotation omitted); *Crane v. Johnson*, 178 F.3d 309, 314 (5th Cir. 1999). And courts will not find ineffective assistance of counsel merely because of a disagreement with counsel's trial strategy. *See Crane*, 178 F.3d at 312 (citing *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997)).

Admittedly, this circuit has held that arguing "residual doubt" may be a reasonable strategy in a capital case.[8] However, in the instant case, Hernandez's attorneys testified that the failure to obtain a verdict on felony murder had foreclosed any possibility that the jury would accept that argument. Attorney Granados agreed that, depending on the facts of the particular case, "residual doubt" could be very powerful. But he also noted that it could also be two-edge sword. SHRR 23. Granados acknowledged that, in light of Hernandez's confession and the DNA evidence, the prosecution had a strong case. *Id.* at 23-24. While a case involving eyewitness identification could allow for a possible powerful "residual doubt" argument regarding that identification, Granados

---

[8]     Nevertheless, as correctly noted by the state habeas court, the Supreme Court "has never held that a defendant has a federal constitutional right to present 'residual doubt' evidence at sentencing nor has the [C]ourt ever held that 'residual doubt' was a constitutionally mandated mitigating factor." SHCR 252 (citing *Oregon v. Guzek*, 546 U.S. 517 (2006)).

believed that, in a case with a confession backed up by a DNA match, trying to bring up "residual doubt" would put him in a position of arguing to the jury that they had not done their job at guilt-innocence. Granados thought this could make the jury "did their heals in against you." *Id.* at 25-26. Consequently, Hernandez's attorneys made the strategic decision to focus their attention on other areas, such as future dangerousness, that might prove more fruitful. *Id.* at 30-31. In this regard, they presented the testimony of Dr. John Tennyson, a psychiatrist, and Margaret Drake, a licensed master social worker and referred to by the Defense as a "mitigation specialist." *Id.* at 29. Since Hernandez has not shown this decision to be objectively unreasonable, the Court must deny relief.

Furthermore, even if counsel had argued "residual doubt" to the jury, there is no reasonable likelihood that the outcome at punishment would have been different. With respect to errors at the sentencing phase of a death penalty trial, the relevant inquiry is "whether there is a reasonable probability that, absent the errors, the sentencer [] would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695; *see also Riley v. Cockrell*, 339 F.3d 308, 315 (5th Cir. 2003) ("If the petitioner brings a claim of ineffective assistance with regard to the sentencing phase, he has the difficult burden of showing a reasonable probability that the

jury would not have imposed the death sentence in the absence of errors by counsel." (internal quotation marks omitted)).   In the instant case, even if Hernandez's attorneys had argued "residual doubt," the DNA evidence and Hernandez's confession rendered the State's guilt-innocence case so airtight there is no reasonable probability that the jury would have reached a different result on punishment because of any lingering concern that Hernandez might be innocent.   Moreover, the State's case on punishment was strong.   As summarized by the Court of Criminal Appeals,

> The record also reflects that [Hernandez] had been convicted of multiple criminal offenses in Michigan.  In 1992, [Hernandez] had been placed on probation for burglarizing a sporting goods store; however, he had committed numerous violations of the conditions of that probation. As a "youthful offender" facing sentencing for his first felony, he had been granted probation for burglarizing a home, but did not successfully complete the probation and was sentenced to jail.  He had also been convicted of felony assault with intent to do great bodily harm, indecent exposure, and misdemeanor malicious destruction of property and engaging in an illegal gambling business.  A former high-school girlfriend testified that [Hernandez] had assaulted her.

*Hernandez v. State,* slip op. at 2-3 (footnote omitted).

Given that not arguing "residual doubt" was am informed, strategic decision and no prejudice could have accrued in any event, Hernandez cannot show that the state court's decision to deny relief was an unreasonable application of the Supreme Court's precedent.  *See, e.g., Bell v. Cone*, 535 U.S. 685, 699 (2002) (holding that the burden is on the petitioner to do more than just

"convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly," but instead the petitioner "must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner"). Therefore, Hernandez's residual-doubt claim should be denied.

## CONCLUSION

For the foregoing reasons, Hernandez's petition for writ of habeas corpus should be denied.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

ANDREW WEBER
First Assistant Attorney General

ERIC J.R. NICHOLS
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction
Litigation Division


 /s/  Stephen M. Hoffman
* Attorney-in-charge          *STEPHEN M. HOFFMAN
                              Assistant Attorney General

-36-

Texas Bar No. 24048978
P. O. Box 12548, Capitol Station
Austin, Texas   78711
Tel:  (512) 936-1400
Fax: (512) 320-8132
Stephen.Hoffman@oag.state.tx.us

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I do hereby certify that on August 27, 2009, I electronically filed the foregoing pleading with the Clerk of the Court for the U.S. District Court, Western District of Texas, using the electronic case-filing system of the Court. The electronic case-filing system sent a "Notice of Electronic Filing" to the following attorneys of record, who consented in writing to accept this Notice as service of this document by electronic means :

Michael Clark Gross
Law Office of Michael C. Gross
106 South St. Mary's St, Suite 260
San Antonio, TX 78205
Email: lawofcmg@gmail.com

Tracy Lynn Spoor
Attorney at Law
509 South Main Street
San Antonio , TX 78204
Email: tlspoor@earthlink.net

     /s/  Stephen M. Hoffman
STEPHEN HOFFMAN
Assistant Attorney General

-37-