UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

FILED

FEB 2 5 2010

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

| | |
|---|---|
| RODRIGO HERNANDEZ,<br>TDCJ No. 999474,<br><br>       Petitioner,<br><br>v.<br><br>RICK THALER, Director,<br>Texas Department of Criminal<br>Justice, Correctional<br>Institutions Division,<br><br>       Respondent. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§    CIVIL NO. SA-08-CA-391-OG |

## MEMORANDUM OPINION AND ORDER DENYING RELIEF

Petitioner Rodrigo Hernandez filed this federal habeas corpus action pursuant to 28 U.S.C. Section 2254 challenging his March 2004, Bexar County capital murder conviction and sentence of death. For the reasons set forth at length below, petitioner is entitled to neither federal habeas corpus relief from this Court nor a Certificate of Appealability.

## I. Background

A.   Factual Background

    1.   The Offense

During the early morning hours of February 18, 1994, petitioner noticed Frito-Lay employee Susan Verstegen while she was restocking shelves at a San Antonio grocery store.[1] Petitioner

_____

[1] A copy of petitioner's written statement detailing his version of the events on the night of Verstegen's death appears as Exhibit L attached to Petitioner's Petition, filed April 22, 2009, docket entry no. 15. The same written statement was admitted into

followed Verstegen around the store to a storage trailer where he engaged her in conversation.   Petitioner then grabbed Verstegen, forced her into the rear seat of her vehicle, where he sexually assaulted her.[2]  During this assault, petitioner grabbed Verstegen by the neck with both hands and held her down.   After he completed his sexual assault upon Verstegen, petitioner noticed she was not breathing.   Petitioner then drove Verstegen's vehicle to a nearby church where he deposited her partially nude body into a trash

---

evidence during petitioner's trial as State Exhibit no. 13 and read in open court. Statement of Facts from Petitioner's Trial (henceforth "S.F. Trial"), Volume 19, testimony of George Saidler, at pp. 82-83.

   [2] San Antonio Police recovered what was later determined to be a semen stain containing the DNA of both Verstegen and an unidentified male from the rear seat of Verstegen's vehicle. S.F. Trial, Volume 19, testimony of Harold Bellamy, at pp. 121-22, 128.
   Subsequent testing of that semen stain against petitioner's DNA revealed petitioner could not be eliminated as a possible source of the semen portion of that mixed stain. S.F. Trial, Volume 20, testimony of Henry R. Hollyday, at pp. 53, 55-60.

can.[3]  Petitioner drove Verstegen's vehicle back to an apartment complex near the grocery store, where he abandoned the vehicle.[4]

### 2.  DNA Tests and a Confession

A few weeks later, petitioner moved back to Michigan, where he resided until an August 2002 CODIS search linked his DNA to the semen found inside Verstegen's body, as well the semen stain found on the rear seat of Verstegen's vehicle.  During an interview with a San Antonio Police detective in Michigan on September 18, 2002, petitioner confessed to the criminal acts summarized above and signed a written statement prepared by the detective.  A second DNA comparison of Verstegen's vaginal swabs and the DNA recovered from the rear seat of Verstegen's vehicle failed to eliminate petitioner

---

[3] In his written statement, petitioner described the location where he deposited Verstegen's body as a park.  The testimony from petitioner's trial, however, established Verstegen's body was actually discovered head-first inside a trash barrel located in the middle of a baseball field behind Prince of Peace Catholic Church, only a short distance from the location where she had been abducted. S.F. Trial, Volume 18, testimony of Liz Greiner, at pp. 158-61.  Crime scene photographs (State Exhibit nos. 52, 53, 54, 55, 62, and 69) and the testimony of law enforcement personnel established that Verstegen's body was found nude from the waist down and resting head down inside the trash barrel. S.F. Trial, Volume 18, testimony of Liz Greiner, at pp. 159-60; testimony of Warren Gilstrap, at pp.174-78, 180-81; testimony of Laura Anderson, at pp. 194-203.  The trash barrel in which Verstegen's body was found had been rolled or dragged approximately forty-four feet from its original location. S.F. Trial, Volume 18, testimony of Warren Gilstrap, at p. 178.

[4] Verstegen's vehicle was recovered in an apartment complex parking lot approximately 300 yards from the grocery store from which she had been abducted. S.F. Trial, Volume 18, testimony of Kenneth Thompson, at pp. 107-09; testimony of Paul Herzig, at pp. 141-48.

3

as a possible source of the seminal portion of those mixed DNA samples.[5]

### 3.   Indictment

On December 11, 2002, a Bexar County grand jury indicted petitioner in cause 2002-CR-8100 on a single count of capital murder, to wit, intentionally causing Verstegen's death by strangling Verstegen with his hands and a ligature (or with his hands) while in the course of committing and attempting to commit the aggravated sexual assault and kidnaping of Verstegen.[6]

## B.   Petitioner's Trial

### 1.   Hearing on Motion to Suppress

On September 29, 2003, the state trial court held an evidentiary hearing on petitioner's motion to suppress petitioner's written statement.  During that hearing, a former Michigan state police officer named Jack Vanderwal testified (1) he executed a search warrant for petitioner's hair and body fluids and interviewed petitioner on September 17, 2002; (2) after being given his *Miranda* warnings and waiving his rights, petitioner denied having any knowledge of Verstegen's death; but (3) after again being given his *Miranda* warnings, petitioner admitted his

---

[5] S.F. Trial, Volume 20, testimony of Henry R. Hollyday, at pp. 47-60.

[6] Transcript of pleadings, motions, and other documents filed in petitioner's trial court proceeding (henceforth "Trial Transcript"), Volume 1, at p. 2.

4

involvement in Verstegen's death the following day to a San Antonio police detective.[7] San Antonio police detective George Saidler testified during the same hearing that (1) when he interviewed petitioner on September 18, 2002 in officer Vanderwal's presence, after being given his *Miranda* warnings, petitioner denied any knowledge of Verstegen's murder; (2) when Saidler informed petitioner of the DNA evidence linking petitioner to the crime, however, the petitioner asked to speak with Saidler alone; (3) once Vanderwal left the interview room, the petitioner became very nervous and emotional, admitted he knew Verstegen, admitted he had raped Verstegen, but claimed he had not intended to kill her; (4) petitioner agreed to give a written statement but asked Saidler to write it because petitioner's hands were shaking too much; (5) after Saidler wrote down petitioner's account of the offense, petitioner signed the bottom of each page of the statement; (6) petitioner also admitted recognizing Verstegen's vehicle as shown in a photograph; (7) petitioner admitted remembering leaving Verstegen's body in the trash can as shown in a another photograph; and (8) petitioner denied anyone else was involved in the offense.[8]

Petitioner did not testify during this hearing. Instead, his retained trial counsel argued petitioner's confession should be

---

[7] S.F. Trial, Volume 2, testimony of Jack Vanderwal, at pp. 24-54.

[8] S.F. Trial, Volume 2, testimony of George Saidler, at pp. 55-82.

suppressed because the San Antonio police detective who obtained same had failed to comply with the requisites of Michigan law. The state trial court concluded petitioner's written statement satisfied the requisites of Texas law for admission and denied petitioner's motion to suppress.[9]

2.   Guilt-Innocence Phase

The guilt-innocence phase of petitioner's capital murder trial commenced on March 15, 2004. In addition to the testimony of the San Antonio police detective who took petitioner's written statement, summarized above,[10] the jury heard testimony from a grocery store employee who saw Verstegen working shortly before her abduction,[11] several of Verstegen's co-workers and family members who engaged in the search for Verstegen following her disappearance,[12] and police officers and other witnesses who located, recovered, and inspected Verstegen's vehicle, hand-held computer, and body.[13]

_____

[9] S.F. Trial, Volume 2, at pp. 84-90.

[10] S.F. Trial, Volume 19, testimony of George Saidler, at pp. 59-109.

[11] S.F. Trial, Volume 18, testimony of Rosa Saenz Mason, at pp. 15-34.

[12] S.F. Trial, Volume 18, testimony of Maurice Hayes, at pp. 34-62; testimony of Juan Martinez, at pp. 63-77; testimony of Kathy Verstegen, at pp. 114-34; testimony of Paul Herzig, at pp. 134-55.

[13] Several San Antonio Police officers testified regarding the search for Verstegen's body and the discovery of same inside a trash barrel that had been dragged into the middle of a baseball

The medical examiner who performed Verstegen's autopsy testified Verstegen (1) suffered no "abnormal" vaginal bruising, (2) had no drugs or alcohol in her blood, (3) suffered contusions on both hands and forearms, (4) suffered ante mortem abrasions on her right breast (which he could not definitively identify as a bite mark) and right upper back of unknown origin, (5) suffered contusions and abrasions on the front of her neck, face, left ear, and under her chin, (6) sustained blanching of the skin to her neck indicating pressure had been applied to her neck prior to her death, (7) displayed marks to her neck that were consistent with strangulation, either by hand (which he considered unlikely) or by a combination of a cloth ligature and hands, (8) displayed petechia (pin point hemorrhages) in both her eyes indicative of death by asphyxiation, (9) suffered slight bruising on both wrists, (10) sustained injuries consistent with her being held down, (11) suffered ante mortem bruising to both legs and post-mortem abrasions to both her legs, (12) suffered a puncture wound to the

---

field behind a church. S.F. Trial, Volume 18, testimony of Kenneth Thompson, at pp. 77-114; testimony of Liz Greiner, at pp. 155-65; testimony of Warren Gilstrap, at pp. 165-92; testimony of Laura Anderson, at pp. 192-206.
    A San Antonio city employee testified about his discovery of the computer printer issued to Verstegen by her employer, as well as the two removable portions (T-tops) of the top of Verstegen's vehicle at a site not far from her abduction. S.F. Trial, Volume 19, testimony of Samuel Rodriguez, at pp. 2-15.
    Two San Antonio Police officers testified regarding their processing of Verstegen's vehicle and the DNA evidence they recovered from same. S.F. Trial, Volume 19, testimony of Harold Bellamy, at pp. 117-30; testimony of Michael Garcia, at pp. 131-41.

inside of her mouth likely caused by a tooth, as well as abrasions
to the jaw line, (13) died as a result of strangulation caused by
either manual or ligature or a combination of both methods, and
(14) suffered brain death as a result of constant pressure being
imposed on the blood vessels in her neck for not less than one
hundred and ten seconds, with attendant loss of consciousness after
only the first eleven seconds.[14]

Petitioner chose not to testify and called no witnesses on his
own behalf during the guilt-innocence phase of trial.[15]

On March 18, 2004, the jury returned its verdict, finding
petitioner guilty of capital murder.[16]

3.   Punishment Phase

The punishment phase of petitioner's capital murder trial
commenced on March 19, 2004.

The prosecution called a pair of parole/probations officers
from Michigan who testified regarding (1) petitioner's membership
in a street gang, (2) petitioner's extensive criminal record, both
as an adult and a juvenile, including petitioner's arrests and

---

[14] S.F. Trial, Volume 20, testimony of Dr. Robert C. Bux, at
pp. 3-32.

[15] S.F. Trial, Volume 20, at pp. 76-78.

[16] Trial Transcript, Volume 4, at p. 478; S.F. Trial, Volume
21, at pp. 42-43; Transcript of pleadings, motions, and other
documents filed in petitioner's state habeas corpus proceeding,
i.e., AP-69,470-01 (henceforth "State Habeas Transcript"), at pp.
113-14.

convictions for breaking and entering, assaulting an ex-girlfriend, assault with intent to rob, and indecent exposure, and (3) petitioner's lengthy history of repeatedly violating the conditions of his parole or probation.[17]

A resident of Grand Rapids, Michigan testified about an incident in 1991 in which the petitioner deliberately exposed himself to the witness's six-year-old and eight-year-old children after the witness had instructed the petitioner, who appeared to be the leader of a gang of youths, to leave the witness's residence.[18]

A former girlfriend of the petitioner testified about (1) an incident in which the petitioner had threatened both her and her family after she broke up with him and (2) a separate incident in which (a) the petitioner dragged her from her car, chased her down the street, caught up with her, grabbed her by the hair, pushed her to the ground, grabbed her by the neck, swung an object at her, forced her to enter the home of a relative of the petitioner, escorted her to the basement, and covered her mouth when she attempted to call out for help, and (b) she escaped from

---

[17] S.F. Trial, Volume 22, testimony of Lisa Gettys, at pp. 8-29, testimony of Paula Gruber, at pp. 29-40.

[18] S.F. Trial, Volume 22, testimony of David Tobin, at pp. 41-46.

petitioner's custody only after her sister arrived on the scene and struck petitioner with a golf club.[19]

Susan Verstegen's adult son testified about the detrimental impact of her murder on his life and his family.[20]

Petitioner's defense counsel called two witnesses who testified during the punishment phase of petitioner's trial. The first, a psychiatrist, testified the petitioner (1) displayed mild depression but no sign of any traditional mental disorder or any tissue-related brain abnormality, (2) had a family history that included social conflict and discord, substance abuse, substance and alcohol abuse beginning at a young age, and incarceration of many family members, (3) was born into a at-risk environment. suffered a disruptive move to Michigan from Texas at an early age, (4) had a history of violence, including resulting head injuries, (5) displayed cognitive impairments, including poor judgment and aggressiveness during his teen years, (6) had engaged in three-quarters of his violent acts prior to 1994, (7) denied engaging in any violent acts as a member of the street gang with which he had been affiliated, (8) had shown demonstrated a dramatic change in his behavior over the last ten years, thanks in part to incarcerations which kept him away from drugs, (9) was now showing

_____

[19] S.F. Trial, Volume 22, testimony of Heather Scudder, at pp. 53-66.

[20] S.F. Trial, Volume 22, testimony of Charles Monney, at pp. 66-91.

artistic talent and the capacity for love and a conscience, (10) was moving away from his anti-social personality, and (11) had expressed remorse.[21]

The second defense witness, a social worker who had investigated petitioner's background, testified (1) petitioner's mother was a drug-abuser who abandoned petitioner shortly after she gave birth to him, (2) despite English being his second language, petitioner did well in school until he moved to Michigan at age ten, at which time petitioner began doing poorly academically and eventually dropped out of school to join a street gang, (3) petitioner grew up in a poor family which relied on AFDC to survive and in which petitioner grew up as a withdrawn, quiet, socially maladjusted individual, (4) nonetheless, petitioner was always very compliant when placed in a structured environment such as a jail or prison, and (5) petitioner has three children and is now a devoted parent who likes to draw.[22]

On March 22, 2004, petitioner's jury returned its verdict at the punishment phase of petitioner's capital murder trial, finding (1) beyond a reasonable doubt there was a probability the petitioner would commit criminal acts of violence that would constitute a continuing threat to society and (2) taking into

---

[21] S.F. Trial, Volume 23, testimony of Dr. John Tennison, at pp. 21-56.

[22] S.F. Trial, Volume 23, testimony of Margaret Drake, at pp. 96-114.

11

consideration all of the evidence, including the circumstances of the offense, the petitioner's character and background, and the petitioner's personal moral culpability, there were insufficient mitigating circumstances to warrant a sentence of life imprisonment be imposed upon petitioner.[23]

The state trial court imposed a sentence of death in accordance with the jury's findings.[24]

C.   Direct Appeal

Petitioner appealed.[25]   The Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence. *Hernandez v. State*, AP-74,931, 2006 WL 367271 (Tex. Crim. App. February 15, 2006).   The United States Supreme Court denied petitioner's petition for writ

---

[23] Trial Transcript, Volume 456-58; S.F. Trial, Volume 23, at pp. 145-47; State Habeas Transcript, at pp. 121-24.

[24] S.F. Trial, Volume 23, at p. 147.

[25] A copy of petitioner's Appellant's Brief appears in the Transcript of pleadings, motions, and other documents filed in petitioner's state habeas corpus proceeding, i.e., WR-69,470-01, (henceforth "State Habeas Transcript") at pp. 40-86.
As points of error on direct appeal, petitioner argued (1) there was insufficient evidence to support the jury's affirmative answer to the future dangerousness special issue, (2) the state grand jury should have been required to make findings regarding why petitioner's offense was death-worthy, (3) the *Penry* or mitigation special issue was unconstitutional because it did not assign a burden of proof, (4) the *Penry* special issue was unconstitutional because it failed to impose the burden of proof on the State, and (5) the Texas capital sentencing scheme's twelve-ten rule was unconstitutional under the Supreme Court's holdings in *Caldwell v. Mississippi* and *McKoy v. North Carolina*

12

of certiorari on October 2, 2006. *Hernandez v. Texas*, 549 U.S. 875,

127 S.Ct. 186, 166 L.Ed.2d 131 (2006).

D.   State Habeas Corpus Proceeding

Petitioner filed an application for state habeas corpus relief

on February 16, 2006.[26]  The state trial court held an evidentiary

hearing on January 25, 2007, during which petitioner called two of

his three former trial counsel to testify.   In an Order issued

February 22, 2008, the state trial court issued its findings of

fact, conclusions of law, and recommendation that petitioner's

application for state habeas corpus relief be denied.[27]  The Texas

Court of Criminal Appeals adopted the trial courts's findings and

conclusions and denied state habeas relief in an unpublished, *per*

---

[26] A copy of petitioner's state habeas corpus application
appears at State Habeas Transcript, at pp. 1-38.   Another copy of
petitioner's state habeas corpus application appears as Exhibit D
attached to Petitioner's Original Petition, filed April 22, 2009,
docket entry no. 15.

As grounds for relief in his state habeas corpus application,
petitioner argued his trial counsel rendered ineffective assistance
by (1) mishandling the hearing on petitioner's motion to suppress
and then withdrawing, (2) failing to challenge the chain of custody
regarding fingernail scrapings, (3) failing to preserve a complaint
that the grand jury must pass on the death-worthiness of a capital
case, (4) failing to preserve a complaint regarding the lack of a
burden of proof in the *Penry* or mitigation special issue, (5)
failing to object to the prosecution's mis-statement of the
pathologists' opinion regarding how the victim was strangled, (6)
failing to object to the prosecution's question to the medical
examiner regarding the amount of time a ligature would have to be
applied to cause a loss of consciousness in the victim, and (7)
failing to urge residual doubt at the punishment phase of
petitioner's trial.

[27] State Habeas Transcript, at pp. 203-55.

*curiam*, Order. *Ex parte Hernandez*, WR-69,47-01, 2008 WL 1914743 (Tex. Crim. App. April, 30, 2008).

E.   Proceedings in this Court

Petitioner filed his petition for federal habeas corpus relief on April 22, 2009, asserting therein a series of complaints of ineffective assistance by his trial counsel, more specifically arguments that his trial counsel rendered ineffective assistance by (1) failing to call petitioner to testify during the hearing on petitioner's motion to suppress, (2) erroneously arguing Michigan law should govern the question of the admissibility of petitioner's confession, (3) failing to object to the prosecution's closing argument regarding the alleged use of a ligature to fatally strangle Verstegen, (4) failing to object to the prosecution's misleading questions to the medical examiner regarding the amount of time necessary to cause death through the use of a ligature, (5) failing to argue residual doubt at the punishment phase of a capital trial or to raise residual doubt through cross-examination, and (6) failing to have a dental expert examine the bite marks on the victim's body and compare same to petitioner's teeth. *Docket entry no. 15.*

Respondent filed his answer on August 27, 2009, arguing the state habeas courts had reasonably rejected petitioner's ineffective assistance claims on the merits because petitioner had failed to present the state habeas court with any evidence showing

14

the actions of petitioner's trial counsel were objectively unreasonable or prejudicial to petitioner. *Docket entry no. 20.*

On November 12, 2009, petitioner filed his reply to petitioner's answer, arguing therein that it was objectively unreasonable for petitioner's trial counsel to (1) argue that Michigan law governed applied to petitioner's motion to suppress and (2) fail to call petitioner to testify during the hearing on petitioner's motion to suppress. *Docket entry no. 23.*

## II. <u>AEDPA Standard of Review</u>

Because petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001). Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141, 125 S.Ct. 1432, 1438, 161 l.Ed.2d 334 (2005); *Williams v.*

*Taylor*, 529 U.S. 362, 404-05, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. Section 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002).  Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown v. Payton*, 544 U.S. at 141, 125 S.Ct. at 1438; *Mitchell v. Esparza*, 540 U.S. 12, 15-16, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003)("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'").  A state court's failure to cite governing Supreme Court authority does not, *per se*, establish the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell v. Esparza*, 540 U.S. at 16, 124 S.Ct. at 10.

16

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown v. Payton*, 544 U.S. at 141, 125 S.Ct. at 1439; *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S.Ct. 2527, 2534-35, 156 L.Ed.2d 471 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *McDaniel v. Brown*, ___ U.S. ___, 130 S.Ct. 665, ___ L.Ed.2d ___, 2010 WL 58361, *7 (January 11, 2010)("A federal habeas court can only set aside a state-court decision as 'an unreasonable application of...clearly established Federal law,' § 2254(d)(1), if the state court's application of that law is 'objectively unreasonable.'"); *Wiggins v. Smith*, 539 U.S. at 520-21, 123 S.Ct. at 2535. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct. 1933, 1939, 167 L.Ed.2d 836 (2007)("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."); *Wiggins v. Smith*, 539 U.S. at 520, 123 S.Ct. at 2535; *Price v. Vincent*, 538

U.S. 634, 641, 123 S.Ct. 1848, 1853, 155 L.Ed.2d 877 (2003)("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner").

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, 660-61, 124 S.Ct. 2140, 2147, 158 L.Ed.2d 938 (2004)("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003).

The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. Section 2254(d)(2) of Title 28, United States Code, provides federal habeas relief may not be granted on any claim that was adjudicated on the merits in the state courts unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Wood v. Allen*, ___ U.S. ___, ___ S.Ct. ___, ___ L.Ed.2d ___, 2010 WL 173369, *6 (January 20, 2010)("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first

18

instance."); *Williams v. Taylor*, 529 U.S. at 410, 120 S.Ct. at 1522 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."). Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determining underlying the factual finding), on habeas review, this does not suffice to supersede the trial court's factual determination. *Wood v. Allen*, ___ U.S. at ___, ___ S.Ct. at ___, 2010 WL 173369, *6; *Rice v. Collins*, 546 U.S. 333, 341-42, 126 S.Ct. 969, 976, 163 L.Ed.2d 824 (2006).

In addition, Section 2254(e)(1) provides a petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro v. Landrigan*, 550 U.S. at 473-74, 127 S.Ct. at 1939-40 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice v. Collins*, 546 U.S. 333, 338-39, 126 S.Ct. 969, 974, 163 L.Ed.2d 824 (2006)("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke*, 545 U.S. 231, 240, 125 S.Ct. 2317, 2325, 162 L.Ed.2d 196 (2005)("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear

and convincing evidence.'"); 28 U.S.C. §2254(e)(1). It remains unclear at this juncture whether Section 2254(e)(1) applies in every case presenting a challenge to a state court's factual findings under Section 2254(d)(2). *See Wood v. Allen*, ___ U.S. at ___, ___ S.Ct. at ___, 2010 WL 173369, *6 (choosing not to resolve the issue of Section 2254(e)(1)'s possible application to all challenges to a state court's factual findings); *Rice v. Collins*, 546 U.S. at 339, 126 S.Ct. at 974 (likewise refusing to resolve the Circuit split regarding the application of Section 2254(e)(1)).

However, the deference to which state-court factual findings are entitled under the AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller-El v. Dretke*, 545 U.S. at 240, 125 S.Ct. at 2325 (the standard is "demanding but not insatiable"); *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003)("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief.").

Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision. *See St. Aubin v. Quarterman*, 470 F.3d

1096, 1100 (5th Cir. 2006)(holding Section 2254(d) permits a
federal habeas court to review only a state court's decision and
not the written opinion explaining that decision), *cert. denied*,
550 U.S. 921 (2007); *Amador v. Quarterman*, 458 F.3d 397, 410 (5th
Cir. 2006)(holding the same), *cert. denied*, 550 U.S. 920 (2007);
*Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003)(holding the
precise question before a federal habeas court in reviewing a state
court's rejection on the merits of an ineffective assistance claim
is whether the state court's ultimate conclusion was objectively
reasonable), *cert. denied*, 541 U.S. 1045 (2004); *Anderson v.
Johnson*, 338 F.3d 382, 390 (5th Cir. 2003)(holding a federal habeas
court reviews only a state court's decision and not the opinion
explaining that decision); *Neal v. Puckett*, 286 F.3d 230, 246 (5th
Cir. 2002)(*en banc*)(holding a federal court is authorized by
§2254(d) to review only a state court's decision and not the
written opinion explaining that decision), *cert. denied*, 537 U.S.
1104 (2003).

### III. <u>Ineffective Assistance Claims</u>

A.   <u>Clearly Established Federal Law</u>

    1.   <u>The Constitutional Standard</u>

The Sixth Amendment entitles criminal defendants to "the
effective assistance of counsel," *i.e.*, legal representation that
does not (1) fall below an objective standard of reasonableness in
light of prevailing professional norms and the circumstances of the

defendant's case (*Wong v. Belmontes*, ___ U.S. ___, ___, 130 S.Ct 383, 384, ___ L.Ed.2d ___ (2009); *Bobby v. Van Hook*, ___ U.S. ___, ___, 130 S.Ct. 13, 16, 175 L.Ed.2d 255 (2009)); and (2) give rise to a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different (*Porter v. McCollum*, ___ U.S. ___, ___, 130 S.Ct. 447, 452-53, ___ L.Ed.2d ___ (2009); *Wong v. Belmontes*, ___ U.S. at ___, 130 S.Ct. at 386).

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland*, i.e., establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003);

*Williams v. Taylor*, 529 U.S. 362, 390-91, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000).  In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. at 687-91, 104 S.Ct. at 2064-66.  Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith*, 539 U.S. at 523, 123 S.Ct. at 2536 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time).  "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook*, ___ U.S. at ___, 130 S.Ct. at 16; *Strickland v. Washington*, 466 U.S. at 688-89, 104 S.Ct. at 2065.  It is strongly presumed  counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542; *Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.*

In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the petitioner's trial counsel chosen a different course). *Wong v. Belmontes*, ___ U.S. at ___, 130 S.Ct. at 386; *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542. *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a capital murder trial would have been different. *Wong v. Belmontes*, ___ U.S. at ___, 130 S.Ct. at 390-91.

In evaluating petitioner's complaints about the performance of his counsel under the AEDPA, the issue before this Court is whether the Texas Court of Criminal Appeals could reasonably have concluded petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis.

*Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003), *cert. denied*, 540 U.S. 1154 (2004).  In making this determination, this Court must consider the underlying *Strickland* standard. *Id.*   In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test, this Court's review of the un-adjudicated prong is *de novo*. *See Porter v. McCollum*, ___ U.S. at ___, 130 S.Ct. at 452 (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. 374, 390, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005)(holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same).

    2.   <u>The Burden to Overcome Presumption of Reasonableness</u>

    A habeas petitioner has the burden to prove both prongs of the *Strickland* ineffective assistance standard by a preponderance of the evidence. *Montoya v. Johnson*, 226 F.3d 399, 408 (5th Cir. 2000), *cert. denied*, 522 U.S. 1067 (2001).

    Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of

reasonable professional judgment. *Bell v. Cone*, 535 U.S. at 698, 122 S.Ct. at 1852; *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066; *Scheanette v. Quarterman*, 482 F.3d 815, 820 (5th Cir. 2007); *Sonnier v. Quarterman*, 476 F.3d 349, 356 (5th Cir. 2007), *cert.* denied, 552 U.S. 948 (2007); *Amador v. Quarterman*, 458 F.3d at 410; *Gonzales v. Quarterman*, 458 F.3d 384, 390 (5th Cir. 2006), *cert. denied*, 549 U.S. 1323 (2007).

Furthermore, under the AEDPA, in order to obtain federal habeas relief on an ineffective assistance claim rejected on the merits by a state court, the petitioner must do more than convince the federal court the state court applied *Strickland* incorrectly - the petitioner must show the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner. *Bell v. Cone*, 535 U.S. at 699, 122 S.Ct. at 1852.

B.   Complaints About the Suppression Hearing

1.   The Claims

Petitioner argues his trial counsel rendered i n e f f e c t i v e assistance by (1) failing to call petitioner to testify at the hearing on petitioner's motion to suppress petitioner's written statement confessing petitioner's involvement in Verstegen's death and (2) arguing Michigan law governed the question of the admissibility of petitioner's statement.[28]

---

[28] Petitioner's Original Petition, filed April 22, 2009, docket entry no. 15 (henceforth "Petition"), at pp. 12-22.

2.   <u>Failure to Exhaust State Remedies</u>

Before seeking federal habeas corpus relief, a state prisoner must exhaust available state remedies, thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' *federal* rights. *Baldwin v. Reese*, 541 U.S. 27, 29, 124 S.Ct. 1347, 1349, 158 L.Ed.2d 64 (2004); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842, 119 S.Ct. 1728, 1731, 144 L.Ed.2d 1 (1999); *Duncan v. Henry*, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995); *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971); 28 U.S.C. §2254(b)(1).  To provide the State with this necessary "opportunity," the prisoner must "fairly present" his claim to the appropriate state court in a manner that alerts that court to the federal nature of the claim. *See Baldwin v. Reese*, 541 U.S. at 29-32, 124 S.Ct. at 1349-51 (rejecting the argument that a petitioner "fairly presents" a federal claim, despite failing to give any indication in his appellate brief of the federal nature of the claim through reference to any federal source of law, when the state appellate court could have discerned the federal nature of the claim through review of the lower state court opinion); *O'Sullivan v. Boerckel*, 526 U.S. at 844-45, 119 S.Ct. at 1732-33 (holding comity requires that a state prisoner present the state courts with the first opportunity to review a federal claim by invoking one complete round of that State's established appellate review process); *Gray v. Netherland*, 518 U.S.

152, 162-63, 116 S.Ct. 2074, 2081, 135 L.Ed.2d 457 (1996) (holding that, for purposes of exhausting state remedies, a claim for *federal* relief must include reference to a specific constitutional guarantee, as well as a statement of facts that entitle the petitioner to relief and rejecting the contention that the exhaustion requirement is satisfied by presenting the state courts only with the facts necessary to state a claim for relief).

Even when liberally construed, nothing in petitioner's state habeas corpus application "fairly presented" the state habeas court with either of the two specific complaints petitioner now raises in his first ground for relief in this federal habeas corpus proceeding, i.e., petitioner's complaints about his trial counsel's argument in favor of Michigan law and failure to call petitioner to testify during the suppression hearing. The exhaustion requirement is not met if the petitioner presents new legal theories *or factual claims* in his federal habeas petition. *Anderson v. Harless*, 459 U.S. 4, 6-7, 103 S.Ct. 276, 277-78, 74 L.Ed.2d 3 (1982). That is precisely what petitioner has done in this cause. By failing to exhaust available state court remedies on the same legal and factual theories petitioner now presents to this Court, petitioner procedurally defaulted on his complaints herein regarding his trial counsel's performance at the suppression hearing. *Bartee v. Quarterman*, 574 F.Supp.2d 624, 657-62 (W.D. Tex. 2008), *CoA denied*, 339 Fed.Appx. 429, 2009 WL 2351641 (5th Cir. July 31, 2009), *cert.*

*filed December 17, 2009 (09-8203).*   However, respondent has not urged this Court to dismiss this unexhausted portion of petitioner's ineffective assistance claims herein as procedurally defaulted.

    3.   <u>State Court Proceedings</u>

        a.  <u>Background</u>

Petitioner was represented initially by a pair of court-appointed trial counsel, attorneys Michael D. Granados and Mario A. Trevino.  In March, 2003, petitioner filed a motion to suppress his own written statement.[29]  In July, 2003, retained counsel Perry Don Cortese appeared on petitioner's behalf.[30]  Attorney Coretse represented petitioner during the hearing on petitioner's motion to suppress held September 29, 2003, at the conclusion of which the state trial court denied petitioner's motion.[31]  A month later, Cortese sought, and was granted, leave to withdraw.[32]  The state trial court thereafter re-appointed attorneys Granados and Trevino and they represented petitioner throughout his capital murder trial.

---

[29] Trial Transcript, Volume 1, at pp. 11-13.

[30] Trial Transcript, Volume 1, at pp. 133-35.

[31] S.F. Trial, Volume 2, at pp. 89-90.

[32] Trial Transcript, Volume 2, at pp. 308-15.

b.   The Suppression Hearing

During the hearing on petitioner's motion to suppress his own written statement, the prosecution presented former Michigan state police officer Jack Vanderwal and San Antonio Police Detective George Saidler, who testified in the manner outlined in Section I.B.1. above.  Near the conclusion of the hearing, the state trial court informed attorney Cortese there was no genuine issue before the court regarding the voluntariness of petitioner's written confession because petitioner had chosen not to testify or otherwise deny the accuracy of the signature contained on petitioner's written statement.[33]   Ultimately, the state court denied petitioner's motions to suppress petitioner's written statement given to Detective Saidler, as well as petitioner's tape-recorded statement given to Officer Vanderwal.[34]

Petitioner did not thereafter renew his motion to suppress or file any additional motion challenging the authenticity of his signature on his written statement.

c.   State Habeas Proceeding

In his first assertion of ineffective assistance in his state habeas corpus application, petitioner complained attorney Cortese

---

[33] S.F. Trial, Volume 2, at pp. 84-86.

[34] S.F. Trial, Volume 2, at pp. 89-90.

elicited information on cross-examination of Vanderwal and Saidler that was harmful to petitioner.[35]

During the hearing held in petitioner's state habeas corpus proceeding, attorney Coretse testified, in pertinent part, that (1) petitioner was prepared to testify at the suppression hearing that he had signed a blank document and the initials on each page of same were not his, (2) petitioner was "extremely nervous" and "very frightened," (3) he did not believe petitioner would have made an effective witness, (4) petitioner's extensive criminal record made petitioner subject to impeachment had petitioner testified at the suppression hearing, and (5) he decided not to call petitioner to testify at the suppression hearing because it would have been petitioner's word against the word of Detective Saidler.[36] Petitioner's former trial co-counsel Michael Granados testified during the same hearing, in pertinent part, that (1) petitioner's written confession was consistent with the defense team's theory that petitioner's offense was felony murder, rather than capital murder, (2) other than having the petitioner testify, the only way to raise "felony murder" as a defense at the guilt innocence phase of trial or to raise "residual doubt" at the punishment phase of trial would have been to introduce petitioner's written confession,

---

[35] State Habeas Transcript, at pp. 13-17.

[36] S.F. State Habeas Hearing, testimony of Perry Cortese, at pp. 6-18.

31

and (3) when the jury rejected the defense's "felony murder" argument at the guilt-innocence phase of trial, the defense team's strategy shifted to an attempt to show the petitioner would not be a future danger if incarcerated.[37]

The state habeas trial court concluded (1) petitioner's written confession was taken in compliance with state and federal law, (2) petitioner's written confession was, therefore, admissible at petitioner's trial, and (3) petitioner's complaints about the performance of his trial counsel during the suppression hearing failed to satisfy the dual prongs of *Strickland*.[38]  The Texas Court of Criminal Appeals adopted the trial court's findings and conclusions when it rejected petitioner's state habeas corpus application. *Ex parte Hernandez*, WR-69,47-01, 2008 WL 1914743, *1 (Tex. Crim. App. April, 30, 2008).

4.   *De Novo* Review

Because the petitioner's state habeas court never had the opportunity to address the merits of petitioner's complaints about his trial counsel's arguments for the application of Michigan law and failure to call petitioner to testify during the suppression hearing, this Court's review of these claims is necessarily *de novo*. *See Porter v. McCollum*, ___ U.S. at ___, 130 S.Ct. at 452

_____

[37] S.F. State Habeas Hearing, testimony of Michael Granados, at pp. 22-31.

[38] State Habeas Transcript, at pp. 238-41.

(holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. 374, 390, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005)(holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same).

    a.   *Cronic* Inapplicable

Insofar as petitioner argues this Court's review of this portion of his claims of ineffective assistance herein is governed by the Supreme Court's holding in *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), petitioner is in error.

In *Cronic*, decided the same day as *Strickland*, the Supreme Court held that a presumption of prejudice similar to that recognized in *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980), for conflicts of interest arises in three narrow circumstances: first, when a criminal defendant is completely denied the assistance of counsel; second, when counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; and finally, where the circumstances are such that even competent counsel very likely could not render effective assistance. *United States v. Cronic*, 466 U.S. at 659, 104 S.Ct. at

2047. As examples of the latter two situations, respectively, the Supreme Court cited the denial of effective cross-examination in *Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974)(defendant was denied the opportunity to cross-examine the prosecution's key witness for bias), and the incendiary circumstances surrounding the trial of the so-called "Scottsboro Boys" addressed in *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932)(no individual attorney was appointed to represent the defendants and trial proceeded after a volunteer attorney from another state appeared on the first day of trial but confessed he had not had an opportunity to prepare for trial). *United States v. Cronic*, 466 U.S. at 659-61, 104 S.Ct. at 2047-48.  In a footnote, the Supreme Court recognized the continuing efficacy of its earlier holding in *Cuyler*, presuming prejudice where a defendant establishes an actual conflict of interest adversely affected his counsel's performance. *United States v. Cronic*, 466 U.S. at 661 n.31, 104 S.Ct. at 2048 n.31.

In *Bell v. Cone*, 535 U.S. 685, 695-96, 122 S.Ct. 1843, 1851, 152 L.Ed.2d 914 (2002), the Supreme Court reiterated that the second exception to the requirement of *Strickland* "prejudice" it had envisioned in *Cronic* was limited to situations in which defense counsel *completely* failed to subject the prosecution's case to meaningful adversarial testing. *See Bell v. Cone*, 535 U.S. at 697-98, 122 S.Ct. at 1851-52 (holding complaints about trial

counsel's waiver of closing argument at the punishment phase of trial and failure to adduce mitigating evidence insufficient to create a presumption of prejudice absent a showing trial counsel completely failed to challenge the prosecution's case throughout the sentencing proceeding).

The presumption of prejudice recognized in *Cronic* does not apply where the defendant complains of merely shoddy or poor performance by his trial counsel; for a defendant to be entitled to such a presumption, his attorney's failure must be complete. *See Bell v. Cone*, 535 U.S. at 697, 122 S.Ct. at 1851 (holding the presumption applicable only when counsel entirely failed to subject the prosecution's case to meaningful adversarial testing); *United States v. Griffin*, 324 F.3d 330, 364, 364 (5th Cir. 2003)("When the defendant complains of errors, omissions, or strategic blunders, prejudice is not presumed; bad lawyering, regardless of how bad, does not support the *per se* presumption of prejudice."); *Riddle v. Cockrell*, 288 F.3d 713, 718 (5th Cir. 2002)(holding "constructive denial of counsel" sufficient to support a presumption of prejudice arises only when counsel was absent from the courtroom, there was an actual conflict of interest, or there was official interference with the defense), *cert. denied*, 537 U.S. 953 (2002); *Mayo v. Cockrell*, 287 F.3d 336, 340 n.3 (5th Cir. 2002)(holding the same), *cert. denied*, 537 U.S. 975 (2002); *Burdine v. Johnson*, 262 F.3d 336, 344 n.4 (5th Cir. 2001)(holding the same), *cert. denied*, 535

336, 344 n.4 (5th Cir. 2001)(holding the same), *cert. denied*, 535
U.S. 1120 (2002).

> "A constructive denial of counsel occurs in only a very
> narrow spectrum of cases where the circumstances leading
> to counsel's ineffectiveness are so egregious that the
> defendant was in effect denied any meaningful assistance
> at all."  We have found constructive denial in cases
> involving the absence of counsel from the courtroom,
> conflicts of interest between defense counsel and the
> defendant, and official interference with the defense;
> and have stated that constructive denial will be found
> when counsel fails to subject the prosecution's case to
> any meaningful adversarial testing.

*Gochicoa v. Johnson*, 238 F.3d 278, 284 (5th Cir. 2000)(*citations
and footnote omitted*).

The garden-variety ineffective assistance complaints
petitioner raises in this federal habeas corpus proceeding
regarding his trial counsel's performance during petitioner's
pretrial suppression hearing do not fall within the scope of the
presumed prejudice rule announced in *Cronic.*

    b.   Argument re Application of Michigan Law

Insofar as petitioner complains in this Court for the first
time that his trial counsel rendered ineffective assistance by
unsuccessfully attempting to convince the state trial court to
suppress petitioner's statements based upon an alleged failure to
comply with Michigan law, petitioner's complaint fails to satisfy
either prong of *Strickland*.  In the course of petitioner's state
habeas corpus proceeding, the state habeas trial court concluded
that petitioner's written statement was admissible under applicable

Texas law.[39]  That determination regarding applicable state law is
binding on this Court in the context of this federal habeas corpus
proceeding. *See Bradshaw v. Richey*, 546 U.S. 74, 76, 126 S.Ct. 602,
604, 163 L.Ed.2d 407 (2005)("We have repeatedly held that a state
court's interpretation of state law, including one announced on
direct appeal of the challenged conviction, binds a federal court
sitting in habeas corpus."); *Amador v. Quarterman*, 458 F.3d 397,
412 (5th Cir. 2006)(holding a federal habeas court must defer to a
state court's interpretation of state law), *cert. denied*, 550 U.S.
920 (2007); *Fuhrman v. Dretke*, 442 F.3d 893, 901 (5th Cir.
2006)(holding the same); *Young v. Dretke*, 356 F.3d 616, 628 (5th
Cir. 2004)("In our role as a federal habeas court, we cannot review
the correctness of the state habeas court's interpretation of state
law.").

Given the state habeas court's conclusion that Texas law
permitted the admission of petitioner's written statement, this
Court independently concludes petitioner's trial counsel's argument
for the application of Michigan law vis-a-vis the admissibility of
petitioner's statement did not cause the performance of said
counsel to fall below an objective level of reasonableness.
Petitioner's trial counsel's argument in favor of using Michigan
law to determine the admissibility of petitioner's confession did
not fall outside the broad parameters of zealous advocacy.

---

[39] State Habeas Transcript, at p. 240.

Likewise, in light of the state habeas court's determination that petitioner's written statement was admissible under applicable Texas law, petitioner was not "prejudiced" within the meaning of *Strickland* by his trial counsel's unsuccessful "Hail Mary" argument requesting the application of Michigan law.

c.   Failure to Call Petitioner to Testify

The failure of petitioner's trial counsel to call petitioner to testify during the suppression hearing is a more complex issue. As petitioner's federal habeas counsel correctly argue, the only practical way to properly raise and preserve a claim that petitioner did not sign his written confession would have been to put petitioner on the stand during the suppression hearing and have him deny signing same.  In fact, as attorney Cortese attempted to explain to the state trial court, the same principle applied even under Michigan law.[40]  Thus, it is more than slightly puzzling why attorney Cortese persisted in arguing in favor of Michigan law's application after failing to have petitioner testify at the suppression hearing in the manner Cortese described during petitioner's state habeas hearing.

Nonetheless, attorney Cortese testified *without contradiction* during petitioner's state habeas hearing that (1) petitioner was extremely nervous, (2) petitioner had a lengthy criminal record, including numerous felony convictions, which could have been used

---

[40] S.F. Trial, Volume 2, at pp. 83-86.

for impeachment, (3) had petitioner testified during the suppression hearing, the issue before the trial court would have come down to a simple credibility finding matching Detective Saidler's testimony that petitioner had signed the written confession against petitioner's self-serving claim that he, a person well-versed in the criminal justice system, had signed a blank form used to obtain a witness statement, and (4) under such circumstances, Cortese believed it would not be productive to have petitioner testify in such a manner at the suppression hearing.[41]

Complaints of uncalled witnesses are disfavored because presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative. *See Coble v. Dretke*, 496 F.3d 430, 436 (5th Cir. 2007)(complaints regarding uncalled witnesses address a matter of trial strategy and are speculative in nature); *Miller v. Dretke*, 420 F.3d 356, 362 (5th Cir. 2005)(such complaints necessarily involve matters of trial strategy); *Graves v. Cockrell*, 351 F.3d 143, 156 (5th Cir. 2003)(such complaints impinge on matters of trial strategy and are speculative in nature); *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002)(such complaints are speculative in nature). This Court's review of attorney Cortese's strategic decision not to call petitioner to testify at the suppression

---

[41] S.F. State Habeas Hearing, testimony of Perry Cortese, at pp. 6-17.

hearing is tempered by the facts (1) petitioner likewise chose not to testify during his state habeas corpus proceeding and deny that he had signed the written statement in question and (2) petitioner has failed to furnish this Court with an affidavit of other written statement sworn under penalty of perjury indicating anything contained in petitioner's written statement was factually inaccurate. Nor has petitioner ever given any testimony or any affidavit to any court challenging the factual accuracy of that portion of Detective Saidler's trial testimony in which Saidler recounted petitioner's many inculpatory *oral* statements.

In light of the foregoing, this Court independently concludes the failure of attorney Cortese to call petitioner to testify during the suppression hearing did not cause the performance of said counsel to fall below an objective level of reasonableness. Cortese reasonably concluded there was little likelihood of petitioner prevailing in a credibility contest with Detective Saidler. No evidence petitioner has presented to this Court causes this Court to second-guess the objective reasonableness of Cortese's conclusion on this point. Petitioner was, and is, an experienced veteran of the criminal justice system. The written statement Detective Saidler testified petitioner signed was consistent with the evidence introduced at petitioner's trial and contained many details about the offense which few other than the perpetrator of Verstegen's violent death could have confirmed.

40

For similar reasons, there is no reasonable probability that, but for Cortese's failure to call petitioner to testify at the suppression hearing, the outcome of either phase of petitioner's trial would have been any different.  Petitioner's DNA matched the semen-fraction of the DNA swabs taken from Verstegen's vagina and the mixed stain found on the rear seat covering of Verstegen's vehicle.[42]  Had Cortese succeeded in getting petitioner's written statement suppressed, petitioner would have been left with no viable means of urging a "felony murder" defense other than testifying during the guilt-innocence phase of petitioner's trial and thereby subjecting himself to what would likely have been a withering cross-examination premised on petitioner's lengthy criminal record, including numerous acts of violence toward women.[43]

Cortese testified during petitioner's state habeas corpus proceeding that, had the defense prevailed at the suppression hearing (and petitioner's written statement been excluded), petitioner's trial strategy would have been to argue petitioner's violent assault upon Verstegen was an act of "consensual sex."[44] Given the extensive injuries Verstegen sustained immediately prior

---

[42] S.F. Trial, Volume 20, testimony of Henry R. Hollyday, at pp. 47, 50-51, 53-55, 59-60.

[43] S.F. State Habeas Hearing, testimony of Michael Granados, at pp. 28-30.

[44] S.F. State Habeas Hearing, testimony of Perry Cortese, at pp. 11-12.

to her death,[45] not to mention the degrading manner in which petitioner disposed of her body, there is no reasonable probability such a "consensual sex" argument would have prevailed at the guilt-innocence phase of petitioner's trial.  Petitioner would have been compelled to testify to raise such a defensive theory, with all the attendant opportunity for a brutal cross-examination by the prosecution discussed above.

Moreover, had petitioner attempted to claim he had been involved in a consensual relationship with Verstegen, the tape recordings of his own telephone conversations with his sister, in which petitioner denied knowing Verstegen, would have furnished a compelling source of impeachment.[46]  In light of this recording, and the total absence of any other evidence now before this Court suggesting petitioner ever had any type of intimate relationship with Verstegen, consensual or otherwise, prior to the night of Verstegen's murder, there is no reasonable probability any defensive theory premised upon "consent" would have had even a remote possibility of success at petitioner's trial.  Neither Cortese nor any of the other defense attorneys who represented

---

[45] *See* note 14, *supra*, and accompanying text.

[46] State Exhibit no. 75, a transcription of a telephone conversation between petitioner and his sister recorded on September 19, 2002, appears in S.F. Trial, Volume 26.  On page three of that transcription, petitioner's sister asked petitioner if he knew the girl, meaning presumably Verstegen, and petitioner responded "No."

petitioner can be faulted for this fact.  Not every criminal charge
can be countered with a potentially viable defense.  *See United
States v. Cronic*, 466 U.S. at 656 n.19, 104 S.Ct. at 2045 n.19 ("Of
course, the Sixth Amendment does not require that counsel do what
is impossible or unethical.  If there is no bona fide defense to
the charge, counsel cannot create one and disserve [sic] the
interests of his client by attempting a useless charade.").

5.   Conclusions

Petitioner failed to present the state courts with the
specific complaints about his trial counsel's performance during
the suppression hearing raised in this Court as petitioner's first
ground for federal habeas corpus relief.  Because no state court
has ever addressed these specific complaints of ineffective
assistance, this Court's review of same is *de novo*.  The
presumption of prejudice authorized by the holding in *Cronic* has no
application to petitioner's complaints about his trial counsel's
performance during the suppression hearing.  Neither of
petitioner's complaints regarding the performance of his trial
counsel during petitioner's suppression hearing satisfy either
prong of *Strickland*.  In fact, had petitioner prevailed on his
motion to suppress, petitioner would have been placed in a
virtually untenable position, unable to raise any non-frivolous
defense without taking the stand to testify during the guilt-
innocence phase of trial and thereby subjecting himself to a

potentially devastating cross-examination based on petitioner's lengthy criminal record. Petitioner's first two complaints herein about his trial counsel's performance do not warrant federal habeas corpus relief.

C.   The Medical Examiner's Findings Re Cause of Death

    1.   The Claims

Petitioner complains that his trial counsel should have objected to the prosecutor's (1) misleading question to the medical examiner regarding the cause of Verstegen's death and (2) misrepresentations on that same subject during closing argument.[47]

    2.   State Court Disposition

        a.   What Dr. Bux Actually Said

On direct examination during the guilt-innocence phase of petitioner's trial, the medical examiner who performed Verstegen's autopsy testified, in pertinent part, as follows:

QUESTIONS BY MR. WHEAT:

> Q. Okay. And then State's exhibit No. 105?
> A. State's Exhibit 105, again shows some contusions and abrasions that are on the neck and face. And there's also another abrasion that's in one of the photographs that's kind of under this chin here.
> Q. Okay. Explain to us here, under the chin there's a marking that says "blanched skin". What does that mean and why is that important?
> A. Well, blanched skin is because of pressure put on the skin. It can be pressure that's there before death; it can be pressure that's applied there after death. And what happens is that after death, blood settles to the -- by gravity, to the lowest portions of the body. So,

---

[47] Petition, at pp. 22-25.

the portions of the body that are closest to the center of the earth are going to have a red color. We call that liver mortis. And it comes -- it takes 30 minutes to a couple of hours before it starts. And you can see that on a body and it gives you an idea what the body position was. In this area we have this blanching that is very evident on the photographs, and that's something you typically don't see.

Q. What does that type of blanching -- what does it usually indicate to you?

A. Well, you can have it where it indicates, for example, if the neck is down, you could have an area of blanching. But the pattern that this has -- there is blanching that goes from side to side, and there's some blanching that goes up. And I think that *that indicates that something was placed over the neck prior to death, either a ligature or hands or combination*.

Q. What do you mean by a "ligature"?

A. A ligature is anything -- any kind of an item whether it's clothing or a belt, a leash, a cord, whatever that you can wrap around the neck and either hang or strangle somebody with.

Q. Okay. Let me get some pictures that I need for that. Just stay where you can see it, and I'll put them up there. Let's begin with the area that we're talking about around on the neck. And I would like to show you a photograph -- let's see if we can pull back as far as possible. Explain to this jury what they are seeing and sort of the significance of the injuries around the neck.

A. Okay. Well, this is the front part of the neck, and this is the left ear and here's the chin, and there's another abrasion kind of underneath the chin over here. And the blanching that I'm taking about -- first of all, there's some small abrasions, and these kind of have a reddish-brown color which I think are ante mortem. And then on to that, you can see this large blanching area here, which could be consistent, in some people, with the head being folded after death. But it's not going to be in keeping with these kind of vertical marks here and this coming across here (indicating). *This has a pattern of something, and that, I think, is probably a ligature of some kind, although it could be done, I suppose, by hands, although it's hard for me to imagine how these lines would be produced that way -- or it could be a combination with ligature or cloth, something like that, and then hands placed on top of it*. Any of that will work.

Q.   Okay.   Have you seen cases, strangulation cases,
where hands are used?

A.   Yes.

Q.   Okay.   What type of pattern do you sometimes see or
often see in that type of case?

A.   Well, it depends on the case.   But sometimes you
won't find -- I've seen a couple of cases where there's
literally been no injuries on the outside of the neck and
then you just see then on the inside.   And then I've seen
them where if it's due to hands, you'll get kind of a
comma shape from somebody putting their fingers into the
skin.   Fingernails can leave a mark and sometimes you see
some linear scratches.   It's fairly nondescript in a
manual strangulation.

Q.   Okay.   This appears to be much more distinct.

A.   Well, part of it is distinct.   I mean, this is here
(indicating).   This could certainly go along with a
manual strangulation (indicating), just there.   And you
don't typically see -- because people are moving and the
victim is trying to struggle, usually the assailant is
moving, as well.   So, things don't stay static, so
there's movement.   And that movement, then, can result in
producing injuries.

Q.   Okay.   Now, your opinion as to cause of death, I
believe, was strangulation.

A.   Correct.

Q.   Does looking at the eyes of a victim help you?

A.   Yes, it does.

Q.   Why does it help you?

A.   People that are strangled or have other kinds of
asphyxial deaths will typically have petechiae, which are
pinpoint little hemorrhages that can be as small or
smaller than a pinhead or they can be larger.   And you
will typically seen them in the pink part of the eye or
sometimes you'll see them in the white part of the eye.
In addition to that, sometimes you can see them above
where the level of the ligature or the strangulation took
place.   In this case, all we can see is in the eye.
*There's some other petechiae on the body down below where
the ligature or hands were placed*, but that I think is
due to the position of the body after death and being
kind of in a head-down position in the barrel.[48]

---

[48] S.F. Trial, Volume 20, testimony of Dr. Robert C. Bux, at
pp. 16-20 (emphasis added).

It is readily apparent from even a cursory review of this portion of Dr. Bux's trial testimony that he did not express a definitive opinion regarding whether Verstegen's strangulation death had been caused by ligature strangulation, manual strangulation, or a combination of the two.  In fact, he took great pains to make plain that her death might have resulted from any of these methods of strangulation *or a combination thereof*.[49]  However, he did made clear he considered purely manual strangulation to be the least likely of those alternative means of causing Verstegen's death.[50]

Dr. Bux again addressed the nature of ligature strangulation shortly thereafter during his testimony on direct:

QUESTIONS BY MR. WHEAT:

> Q.  Okay.  Let me show you State's Exhibit 97, and I
> know I'm going back to the neck for a second, but it's a
> side view.  Okay?  And it appears that the blanching of
> the skin that you talked about ends there, that it stops
> at that point.  Explain why that's important and what
> that shows you.
> A.  Well, again, part of this you can explain and can be
> due to the neck being down.  But when you get it -- and,
> for example, these lines here are consistent with skin
> folds with somebody down and their head is over.  But
> again, when you start looking at these vertical areas
> here (indicating), that doesn't make any sense.
> Q.  Okay.  As far as the neck goes, was there any -- it
> a ligature is actually tied around a person's neck, what
> type of mark would you get?
> A.  You may get blanching, you may get abrasions, you

---

[49] *Id.*, at p. 18.

[50] *Id.*

may get some contusions.  It depends on how much force is used and whether the person is moving or not.
Q.  Would you expect the blanching to be on the back of the neck?
A.  You may if it's completely circumferential.  If you have a ligature that is placed and pushed down on somebody's neck, then it's going to stop on the sides.  It's not going to go on the back, because it doesn't circle the neck.
Q.  Okay.  So, in this case, does it appear that any type of ligature circled the neck?
A.  No.
Q.  It would have been a ligature used where you were holding it down or pushing down?
A.  That would be one way you could produce those injuries, yes.[51]

Near the end of his testimony on direct, Dr. Bux and the prosecutor again returned to the subject of the manner of strangulation most likely to have been used to kill Verstegen but then shifted to a discussion regarding the length of time it would be necessary to apply force to Verstegen's neck to have caused her death:

QUESTIONS BY MR. WHEAT:

Q.  Okay.  Based on the injuries that we've gone over, what was your official conclusion as to cause of death?
A.  I believe that she was strangled -- due to strangulation.
Q.  Okay.  And also based on the injuries that we've discussed and the jury has seen, what was the manner in which strangulation was effected?
A.  Homicide.
Q.  *And how, in what way, was the strangulation carried out?*
A.  *Well, I'm not sure.  There are two ways you can strangle somebody -- or actually, three.  You can use a ligature, which again would be something like a piece of cloth, a leash, a cord, anything like that.  You could*

---

[51] *Id.*, at pp. 21-22.

*either wrap it completely around the neck or wrap it and push down on the sides. That would be one way. The other way is by using your hand or hands and placing that around the neck and squeezing. And, of course, the third is a combination where you could put your hands around the neck or on top of a ligature that's already there or a piece of clothing. And so, any of those would work.*
Q. *Okay. And in this case, in Susan Verstegen's case, what are the two ways in which she could have been strangled?*
A. *Either could have been with a ligature or a ligature plus the hands. There's no way to specifically tell which occurred because of the nondescript marks on the neck.*
Q. Okay. Now, if a person is being strangled by another person, describe for the jury sort of how long it would take for a person after the ligature is applied to their neck, just take us through the course of what would happen.
A. In order to get loss of consciousness, one needs to occlude the vessels that either pump blood to the head like the carotid arteries and the vertebral arteries or you need to obstruct the jugular veins which drain all the blood from the head. So, even though the arteries are pumping blood out, the blood can't get back out; and therefore, you don't have blood being -- circulating in the head, particularly in the brain.

Because there are petechiae, those little pinpoint hemorrhages, at some time during the strangulation there was enough force put on the neck that the carotid arteries and the vertebral arteries could pump blood and the jugular veins were compressed so that they wouldn't drain blood. And that causes increased pressure in the little capillaries, little tiny blood vessels, and they burst when they're under that kind of pressure and that causes petechial hemorrhage. That's one theory.

The other theory is that if you compromise them and close off the vessels, then there's an increase in what's called carbon dioxide, which you have oxygen and then the cells turn into carbon dioxide and they metabolize and stay alive by doing that. And so if that $CO_2$ goes up, that also may trigger the petechiae. But I think most people believe that the first theory is what typically happens. Now, if you occlude all the arteries and the veins, then at that point you're not going to get petechiae. But she had them.

In terms of what happens on the sequence, once the ligature is firmly -- or the hands are firmly around the

neck, at about 50 percent of the people, if the compression is complete, will lose consciousness in about five to six seconds, and everybody will be unconscious in about eleven seconds. We also know through some experiments that if you keep that pressure on, that everybody will be unconscious -- and if we hold it for 100 seconds, a little over a minute and a half, and then we release it, we know that all those people will regain consciousness within just a few seconds or so and that they'll literally be able to walk out of a room within a couple of minutes and be back to normal.

So, we know that it takes at least -- that up to at least 100 seconds we can keep it occluded and the person can not only survive, but rapidly regain consciousness and return to the normal state. We don't know, obviously, further out from that. The reason why the experiments were stopped was because at about 100 seconds, some people were developing cardiac arrhythmia, or irregular heartbeats, and it was felt if you kept it on longer, that they might get a lethal cardiac rhythm and maybe die. So, you don't want to kill your experimental subjects.

Q. Let's say there is somebody who is, and in this case, somebody who is having sex with Susan Verstegen and her airway becomes occluded -- or is about to become occluded, what reaction would you expect from the victim?

A. She's going to try to re-establish that airway, and she's going to do that by struggling and trying to get whatever it is that's compromising her airway, *whether it's hands or ligature or a combination*, off her neck.

Q. All right. And if both the sex and the airway continue to be blocked at the same time, what's going to happen?

A. Well, the next thing that's going to happen in a few seconds is she's just going to be unconscious. So, she'll cease all kinds of movement and the only movement that you might get at some point -- and particularly way down the line timewise [sic], you may get a convulsion. But other than that, they're going to be limp and there will be no purposeful movement.

Q. How long would a person then have to hold Susan Verstegen's neck before she would not come back to consciousness?

A. That's a good question. We know that they'll come back in 100 seconds. We don't know what the magic number is after that. It would be at least two to three minutes, and it might be longer in somebody that's young and healthy like she was. We know that in people where

50

we compromise their blood flow to the brain, that after
about three minutes of having no oxygen in blood going to
the brain, that they can start to have irreversible brain
damage.  We know that an adult with about 6 to 8 minutes
with no blood flow to the brain, you're going to have
brain death.
Q.  *Is it fair to say that the absolute minimum that a
person would have to hold a ligature on Susan Verstegen's
neck after she lost consciousness is two minutes?*
A.  *Yes, sir.  I think that would be very conservative.*
Q.  Do you have a watch on?
A.  Yes, sir.
Q.  When I say "start", could you please start?  And
when it hits two minutes, please tell us.
A.  Okay.
Q.  Start.
(Whereupon, a period of complete silence in the courtroom).
A.  Two minutes.
Q.  I have no more questions.[52]

   b.   The Prosecution's G-I Phase Closing Argument

During closing argument at the guilt-innocence phase of trial,

the prosecution argued, in part, as follows:

      Next are his injuries to Susan.  Okay?  And you've
got the photos.  But you know, this is part of our proof.
Okay.  The injuries both before and after and the way he
treated her.  Okay?  And you remember Dr. Bux, and this
is very important.  These marks right here on her neck,
okay, you recall him talking about those marks.  It means
that at least some type of ligature was used -- either
ligature or ligature and hands.  And remember that,
because we're going to talk about it when we get to the
defendant's statement.  All of these show you without
question sexual assault, without question no consent.
And you remember -- everyone remembers the two-and-a-half
minutes before she's unconscious.  And the fact that the
ligature doesn't go all the way around the neck means you
have to actually hold it with your hands.  You have to
hold it down.  It's not something you tie.  You apply the

_____

[52] *Id.*, at pp. 27-32 (emphasis added).

51

pressure that cuts off the blood.  You apply the pressure that cuts off the air.[53]

Petitioner's trial counsel made no objection to this portion of petitioner's closing argument.

      c.   <u>State Habeas Proceeding</u>

In his fifth and sixth claims for state habeas corpus relief, petitioner argued his trial counsel should have objected to (1) the prosecutor's question regarding the minimum amount of time a person would have to hold a ligature on Susan Verstegen's neck after she lost consciousness to cause her death was improper because it misrepresented what Dr. Bux had testified regarding the manner in which Verstegen was strangled and (2) the prosecution's characterization during guilt-innocence phase closing argument of Dr. Bux's testimony as establishing definitively that a ligature was used to strangle Susan Verstegen.[54]

During the evidentiary hearing held in petitioner's state habeas corpus proceeding, petitioner called attorney Michael Granados, one of petitioner's two former trial counsel, to testify. However, petitioner failed to question attorney Granados regarding why the defense team chose not to object to either the prosecution's question to Dr. Bux referenced above or to the portion of the prosecution's closing argument quoted above.

---

[53] S.F. Trial, Volume 21, at pp. 32-33.

[54] State Habeas Transcript, at pp. 25-28.

52

The state habeas trial court concluded (1) the prosecutor's question to Dr. Bux was wholly proper and (2) the prosecutor's closing argument was a wholly proper summation of the evidence or based upon deductions reasonably drawn from the evidence.[55] Accordingly, the state habeas trial court concluded petitioner's complaints about the performance of his trial counsel did not satisfy the deficient performance prong of *Strickland*.[56] The Texas Court of Criminal Appeals adopted these conclusions when it denied petitioner's state habeas corpus application. *Ex parte Hernandez*, WR-69,47-01, 2008 WL 1914743, *1 (Tex. Crim. App. April, 30, 2008).

### 3.   AEDPA Review of No Deficient Performance Conclusions

There was nothing objectively unreasonable with the manner the Texas Court of criminal Appeals applied the deficient performance prong of *Strickland* in rejecting both of these complaints about the performance of petitioner's trial counsel.

#### a.   The Question Regarding Duration of Strangulation

Petitioner complains his trial counsel should have objected to the following question: "Is it fair to say that the absolute minimum that a person would have to hold a ligature on Susan Verstegen's neck after she lost consciousness is two minutes?" Petitioner argues that question "required clarification to prevent

---

[55] State Habeas Transcript, at pp. 246-50.

[56] *Id.*

53

the jury from believing Dr. Bux had ruled out mere hands as the method of strangulation."[57]

By the time the prosecution asked Dr. Bux, albeit less than artfully, *how long* someone would have to continue strangling Verstegen *after* she lost consciousness to induce death, Dr. Bux had testified that (1) he could not ascertain the precise manner in which Verstegen had been fatally strangled, (2) because of the marks on Verstegen's neck, he believed it was unlikely she died as a result of purely manual strangulation, (3) the absence of marks on the back of her neck indicated a ligature had *not* been tied completely around her neck and tightened, and (4) he believed the most likely methods used to cause her death were either ligature strangulation or a combination of ligature and manual strangulation in which a ligature was pressed down on the front of Verstegen's neck with the hands.[58]

The full context of the prosecution's allegedly improper question to Dr. Bux is set forth in detail above. The focus of the prosecution's allegedly improper question was *not* on ascertaining the method of strangulation used to cause Verstegen's death. Instead, the prosecution was attempting to elicit from Dr. Bux an estimate as to the amount of time *after* Verstegen had been rendered unconscious that the petitioner would have had to *continue* to

---

[57] Petition, at p. 24.

[58] *See* notes 48-52 *and accompanying text.*

54

strangle Verstegen to ultimately cause her death.   Thus, the allegedly objectionable question was more in the nature of a hypothetical inquiry into the duration of the strangulation Verstegen suffered than one inquiring about the specific method used to cause her death.   Under such circumstances, the state habeas court's conclusion that the question was unobjectionable was eminently reasonable.

The state habeas court's conclusion that petitioner's trial counsel's failure to object to same was, likewise, equally reasonable under the objective standard of *Strickland's* initial prong.   There is nothing objectively unreasonable with a trial counsel's failure to raise a meritless or groundless objection. *See Paredes v. Quarterman*, 574 F.3d 281, 291 (5th Cir. 2009)(failure to raise a merittless objection is not deficient performance); *Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002)(there was nothing deficient in counsel's failure to object to the admission of psychiatric testimony that was admissible under then-existing precedent), *cert. denied*, 538 U.S. 926 (2003); *Robison v. Johnson*, 151 F.3d 256, 261 (5th Cir. 1998)(nothing deficient regarding trial counsel's failure to seek admission of a document the state court concluded was inadmissible), *cert. denied*, 526 U.S. 1100 (1999); *Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir. 1997)(failure to assert a meritless objection cannot be the grounds for a finding of deficient performance), *cert. denied*, 525 U.S. 969 (1998); *Meanes*

*v. Johnson*, 138 F.3d 1007, 1012 (5th Cir. 1998)(counsel was not constitutionally deficient for failing to raise an objection if, at the time of trial, the objection would have been futile in light of existing state law and the right asserted in the proposed objection was not clearly established), *cert. denied*, 525 U.S. 968 (1998).

Furthermore, making the objection petitioner might urges would have served to reinforce in the jury's mind the possibility (which Dr. Bux testified he considered doubtful) that petitioner had fatally strangled Verstegen using solely his bare hands. While all of the forms of strangulation Dr. Bux described as possible cause of Verstegen's death were brutal, petitioner's trial counsel might have had perfectly reasonable strategic reasons for not wishing to re-emphasize the possibility of purely manual strangulation at that particular juncture of petitioner's capital murder trial. During petitioner's state habeas corpus proceeding, when he had the opportunity to do so, petitioner did not bother to explore his trial counsel's rationale for not making the objection in question. Under such circumstances, the state habeas court reasonably concluded petitioner had failed to carry his burden of showing this particular omission by petitioner's trial counsel was objectively unreasonable under the circumstances as they existed at the time of petitioner's trial.

A convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel

falls within a wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. at 687-91, 104 S.Ct. at 2064-66. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith*, 539 U.S. at 523, 123 S.Ct. at 2536 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). It is strongly presumed counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066. The state habeas court reasonably concluded petitioner had failed to carry this burden.

b.   Prosecution's Closing Argument at G-I Phase

Petitioner argues his trial counsel should have objected to the petitioner's argument that Dr. Bux had testified "some type of ligature was used -- either ligature alone or ligature and hands."[59]

The state habeas court reasonably concluded that, viewed in proper context, the portion of the prosecution's guilt-innocence phase closing argument about which petitioner complains was not objectionable because it correctly summarized Dr. Bux's opinions

---

[59] Petition, at p. 23.

regarding the cause of Verstegen's death.   Having carefully reviewed the entirety of Dr. Bux's testimony and the prosecution's closing guilt-innocence phase argument, this Court independently reaches the same conclusion.   *See Buxton v. Collins*, 925 F.2d 816, 825 (5th Cir. 1991)(recognizing the four proper areas for prosecutorial jury argument are summation of the evidence, reasonable inference from the evidence, answers to opposing counsel's argument, and pleas for law enforcement), *cert. denied*, 498 U.S. 1128(1991).

Dr. Bux indicated that, while purely manual strangulation remained a possibility, he considered it more likely Verstegen died as a result of either ligature strangulation or a combination form of strangulation resulting from hand pressure directly forcing a ligature down on the front of her neck.   Thus, there was nothing unreasonable about the state habeas court's conclusion that petitioner's trial counsel's failure to raise the objection now urged by petitioner did not cause the performance of petitioner's trial counsel to fall below an objective level of reasonableness. The state habeas court's conclusion represents a perfectly reasonable application of the first prong of *Strickland*.  There was nothing unreasonable with the failure of petitioner's trial counsel to make what would have been a frivolous objection.

Moreover, as with petitioner's complaint about the prosecution's question to Dr. Bux, petitioner made no effort during

his state habeas corpus hearing to interrogate his trial counsel
regarding why the defense team chose not to object to this argument
when the prosecution made it during closing argument.  Once again,
petitioner's defense counsel is presumed to have had a valid
strategic reason for refraining from making such an objection.
*Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066.
Petitioner wholly failed to present the state habeas court with any
evidence showing his trial counsel's decision not to object to the
prosecution's argument in question was objectively unreasonable.
Petitioner's trial counsel may have let the prosecutor's comment
pass because the objection petitioner now urges, even if granted,
would likely have elicited not a mistrial but simply a reminder
from the trial court to the jurors that they were the final
arbiters of the facts and that nothing counsel said constituted
evidence.  Finally, such an objection would likely have re-enforced
the gruesome specter of a purely manual strangulation and its
attendant brutality.  Petitioner failed to overcome the presumption
of reasonable which must be afforded his trial counsel's decision
not to raise what would have amounted to a meritless objection.

    4.   *De Novo* Review of Prejudice Prong of *Strickland*

    Because the state habeas court dd not expressly address the
prejudice prong of *Strickland* when it rejected the particular
ineffective assistance claims, this Court's application of the
prejudice prong of *Strickland* to petitioner's complaints about his

trial counsel's failure to make the objections in question is necessarily *de novo*. *See Rompilla v. Beard*, 545 U.S. at 390, 125 S.Ct. at 2467 (holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same).

The failure of petitioner's trial counsel to raise meritless objections to the prosecution's wholly appropriate question to Dr. Bux and closing argument did not "prejudice" petitioner within the meaning of *Strickland*. *see Paredes v. Quarterman*, 574 F.3d at 291 (failure to make a meritless objection did not prejudice defendant).

The prosecution's case against petitioner at the guilt-innocence phase of trial was extremely strong. Petitioner's DNA was found to match the semen portion of Verstegen's vaginal swab, as well the mixed stain found on the rear seat of Verstegen's vehicle. Petitioner's written confession suggested, albeit in an extremely oblique manner, that his intent had been merely to sexually assault Verstegen and that her death had not been deliberate. However, Dr. Bux testified without contradiction that it would have been necessary for the petitioner to have maintained pressure on Verstegen's neck for at least 100 seconds *after* she

became unconscious to have caused her death. This expert testimony, which petitioner has never sought to refute in any judicial proceeding, effectively negated petitioner's argument that her death had been accidental. Furthermore, the brutal manner of the murder was accompanied by other evidence showing petitioner disposed of Verstegen's half-naked body by shoving her head-first down into a trash barrel and then rolling or dragging that same barrel out into the middle of a baseball diamond located on the grounds of a church, where the lewd scene was likely to be discovered by children. This Court independently concludes there is no reasonable probability that, but for the failure of petitioner's trial counsel to make either of the objections regarding Dr. Bux's interrogation or the prosecution's argument based thereon now urged by petitioner, the outcome of either phase of petitioner's trial would have been different.

Moreover, even if petitioner's trial counsel had made the objections petitioner now urges and the state trial court had granted both such objections, those rulings would not have excluded any of Dr. Bux's highly inculpatory opinion testimony regarding the cause and circumstances of Verstegen's death. For instance, an objection to the allegedly improper question (even if sustained) would likely have resulted in the prosecutor re-phrasing his question about relevant time frames to make clear he was inquiring into the amount of time the petitioner had to have strangled

Verstegen (regardless of the method he employed) to have caused her death. Regardless of how poorly the prosecutor may have phrased his question, there is every probability that, ultimately, petitioner's jury was going to learn that Dr. Bux believed it was necessary for a person to be strangled for more than 100 seconds after losing consciousness before death would result.

Likewise, even if petitioner's trial counsel had successfully objected to the allegedly objectionable portion of the prosecution's guilt-innocence phase argument regarding the cause of Verstegen's death, there is no reasonable probability such a successful objection would have altered the outcome of the guilt-innocence phase of petitioner's trial. The trial court would likely have followed such a ruling with a reminder to the jury to rely upon its own recollection of Dr. Bux's trial testimony and not that of either counsel. The precise method petitioner employed to fatally strangle Verstegen was not a determining factor at either phase of petitioner's capital murder trial; what was relevant was Dr. Bux's opinion (unchallenged to this date) that it would have been necessary for petitioner to continue to strangle Verstegen at least 100 seconds *after* she lost consciousness in order to cause her death. Nothing petitioner has presented to this Court was going to prevent the prosecution from eliciting that opinion testimony from Dr. Bux or from arguing that Verstegen's injuries were entirely inconsistent with an accidental homicide during the

course of an obviously brutal sexual assault.  Moreover, the brutal
details of Verstegen's murder, the lewd manner in which petitioner
disposed of her body, petitioner's lengthy criminal history
(including numerous violent acts toward women), together with
petitioner's failure to demonstrate any sincere contrition or
remorse before the jury virtually guaranteed petitioner's jury
would respond to the Texas capital sentencing special issues in the
manner they did.

    5. <u>Conclusions</u>

The Texas Court of Criminal Appeals' rejections on the merits,
during the course of petitioner's state habeas corpus proceeding,
of petitioner's ineffective assistance claims complaining about his
trial counsel's failure to object to the prosecution's question to
Dr. Bux and the prosecution's closing argument at the guilt-
innocence phase of trial were neither contrary to, nor involved an
unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States, nor the
products of an unreasonable determination of the facts in light of
the evidence presented in the petitioner's state habeas corpus
proceeding.  The state habeas court reasonably concluded there was
nothing objectively unreasonable with the failure of petitioner's
trial counsel to make what would have been a pair of meritless
objections.  Furthermore, this Court independently concludes the
failure of petitioner's trial counsel to raise either of these

objections did not "prejudice" petitioner within the meaning of *Strickland*.   There is no reasonable probability that either objection, even if timely made and sustained, would have had any impact whatsoever on the outcome of either phase of petitioner's capital murder trial.   Petitioner's third and fourth ineffective assistance claims herein do not warrant federal habeas corpus relief.

D.   Failure to Argue Residual Doubt

   1.   The Claim

   In his penultimate ineffective assistance claim herein, petitioner argues his trial counsel should have "attacked through additional evidence, vigorous objections, and closing argument, the serious lack of proof as to Rodrigo's guilt of the capital murder."[60]   Petitioner argues such efforts should have been focused on raising "residual doubt" about petitioner's guilt during the punishment phase of trial.

---

   [60] Petition, at p. 30.
   Of course, petitioner does not bother to offer any clue as to precisely what 'additional evidence" of petitioner's innocence was available at the time of trial.   Nor does petitioner identify any specific objections, other than those which the state habeas court and this Court have both concluded were utterly groundless, which he now claims should have been raised during trial.   Finally, petitioner furnishes no suggestion as to precisely what closing argument his trial counsel should have made that might have resulted in a different verdict at either phase of petitioner's trial.

2.   <u>State Court Disposition</u>

In his seventh ground for state habeas relief, petitioner argued his trial counsel "should have raised residual doubt through cross examination and argument as to why the prosecutors relied on mere science and a three page statement to argue in favor of putting Mr. Hernandez to death."[61]   Petitioner also argued the re was a lack of testimony establishing the chain of custody in connection with the DNA evidence which established petitioner's semen was found in Verstegen's vaginal swabs and on the rear seat of verstegen's vehicle.[62]

During the evidentiary hearing held in petitioner's state habeas corpus proceeding, petitioner's former trial co-counsel, attorney Michael Granados, testified, in pertinent part, that (1) in his opinion, the efficacy of using residual doubt at the punishment phase of a capital trial depends on the facts of the particular case, (2) however, a residual doubt argument can also be a double-edged sword, (3) residual doubt could be effective if the prosecution's case relied on eyewitness identification testimony, (4) but would be less effective when confronting a case where there

---

[61] State Habeas Transcript, at p. 36.

[62] State Habeas Transcript, at pp. 28-37.

is a confession backed up by DNA.[63]   More specifically, Granados

explained his strategic thinking as follows:

> When you have a case where there is a confession
> backed up by DNA, it could be -- and it's my feeling,
> that to try to bring up residual doubt puts you in a
> position of arguing with the jury and basically telling
> them that you don't believe they did their job.  And it
> can make them dig their heals [sic] in against you.[64]

Granados explained further that (1) the defense team's strategy

during the guilt-innocence phase of trial had been to argue

petitioner had not intended to kill Verstegen, (2) but the jury

rejected that argument when it found petitioner guilty of capital

murder, and (3) therefore, the defense team shifted its focus at

the punishment phase of trial to try and convince the jury that,

because of petitioner's growing maturity and peaceful prison

disciplinary record, petitioner would not pose a risk of future

dangerousness if sentenced to a term of life imprisonment without

the chance for parole.[65]

The state habeas trial court found (1) the strategy chosen by

petitioner's trial counsel during the punishment phase of trial

(i.e., arguing petitioner's non-violent behavior during prior

incarcerations proved he would not be a future threat in prison)

was "made by counsel after thorough investigation of the law and

---

[63] S.F. State Habeas Hearing, testimony of Michael Granados,
at pp. 24-26.

[64] Id., at pp. 25-26.

[65] Id., at pp. 28-31.

facts relevant to plausible options, (2) petitioner failed to present that court with any evidence establishing such a strategy was objectively unreasonable given the fact the jury had already rejected defense counsel's felony murder arguments at the guilt-innocence phase of trial, and (3) there was no evidence in the record upon which petitioner's counsel could have based a "residual doubt" argument at the punishment phase of trial.[66]   The state habeas trial court concluded petitioner's trial counsel's strategic decisions did not render the performance of said counsel deficient under the first prong of *Strickland*.[67]   The Texas Court of Criminal Appeals adopted these findings and conclusions when it rejected petitioner's state habeas corpus application. *Ex parte Hernandez*, WR-69,47-01, 2008 WL 1914743, *1 (Tex. Crim. App. April, 30, 2008).

3.   AEDPA Review of Deficient Performance Prong

There was nothing objectively unreasonable with the state habeas court's conclusion that petitioner's trial counsel acted in a perfectly reasonable manner in choosing their strategy at the punishment phase of petitioner's capital murder trial.   As the state habeas trial court noted, and attorney Granados explained, by the time the petitioner's trial reached the punishment phase, the jury had already rejected petitioner's trial counsel's argument that Verstegen's death had been accidental.   Frankly, given the

---

[66] State Habeas Transcript, at pp. 251-52.

[67] State Habeas Transcript, at pp. 253-54.

extent of the violent assault upon Verstegen revealed during her autopsy, including Dr. Bux's unchallenged expert opinion testimony regarding how long petitioner would have had to continue to choke Verstegen after she lost consciousness, such a conclusion was inevitable. Moreover, attorney Granados furnished compelling testimony as to why the defense team believed asserting "residual doubt" at the punishment phase of trial could prove not merely ineffective but actually harmful to their efforts to obtain a life sentence for petitioner. Petitioner presented the state habeas court with no evidence suggesting Granados' concerns in that regard were unjustified, much less objectively unreasonable, under the circumstances.

The reality facing petitioner's trial counsel at the punishment phase of trial was that their client had just been convicted of a committing an extremely violent murder which involved fatally choking the victim more than 100 seconds after she lost consciousness. To add insult to injury, the petitioner than disposed of her body in a particularly lewd manner at a location where young people were likely to discover her. Petitioner even went so far as to drag or roll the trash barrel containing Verstegen's body more than forty feet on to a parish baseball diamond. Petitioner had signed a written confession, supported by DNA evidence showing he had sexually assaulted Verstegen, admitting he killed Verstegen but claiming he had done so unintentionally.

The jury implicitly rejected this claim when it refused to find petitioner guilty of the lesser-included offense of felony murder. The performance of trial counsel must be evaluated in light of the situation defense counsel faced at the time of the act or omission in question, not years later. *Black v. Cockrell*, 314 F.3d 752, 754 (5th Cir. 2002), *cert. denied*, 538 U.S. 988 (2003). Because the jury had implicitly rejected petitioner's claim that he accidentally killed Verstegen, as a practical matter, there was no *credible* expression of remorse or contrition by petitioner before the jury at the start of the punishment phase of petitioner's trial.

Faced with the foregoing facts, this Court independently concludes the decision of petitioner's trial counsel not to argue "residual doubt" at the punishment phase of trial but, instead, to focus on the petitioner's non-violent prison disciplinary record and argue petitioner would not likely pose a threat of future dangerousness if imprisoned for life without parole was an eminently reasonable exercise of professional judgment and a sound trial strategy. Petitioner failed to present the state habeas court with any evidence sufficient to overcome the presumption of reasonableness to which such a strategic decision is entitled. *See Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066 (strategic decisions made by defense counsel are presumed reasonable). Petitioner presented the state habeas court with no

evidence showing his trial counsel's strategic decision in this regard was based on an incomplete or inadequate investigation of relevant law or the facts of petitioner's case. On the contrary, the state habeas trial court expressly found petitioner's trial counsel made their decision with regard to their punishment phase trial strategy after a thorough investigation of all relevant law and facts. That factual finding was a clearly reasonable determination given the circumstances of petitioner's case. *See Wood v. Allen*, ___ U.S. at ___, ___ S.Ct. at ___, 2010 WL 173369, *6 (federal habeas review of factual findings is highly deferential, even under the standard set forth in Section 2254(d)(2)).

The state habeas court's conclusion that this aspect of petitioner's ineffective assistance claims failed to satisfy the deficient performance prong of *Strickland* was an eminently reasonable application of clearly established federal law.

4.   *De Novo* Review of Prejudice Prong

Because the state habeas court dd not expressly address the prejudice prong of *Strickland* when it rejected petitioner's complaint about his trial counsel's failure to urge "residual doubt" at the punishment phase of petitioner's trial, this Court's application of the prejudice prong of *Strickland* is necessarily *de novo*. *Rompilla v. Beard*, 545 U.S. at 390, 125 S.Ct. at 2467; *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542.

70

This Court independently concludes this particular ineffective assistance claim is utterly devoid of arguable merit.   After the petitioner's jury rejected petitioner's "felony murder" defense at the guilt-innocence phase of trial, there was no legal or factual basis for arguing "residual doubt" at the punishment phase of petitioner's trial.   By that point, the jury had not only implicitly accepted as credible the DNA evidence linking petitioner to Verstegen's violent murder but had also implicitly rejected petitioner's claim in his written statement that Verstegen's death had been accidental.   Under such circumstances, as attorney Granados correctly pointed out,[68] the only way to raise "residual doubt" would have been to have petitioner take the stand at the punishment phase of trial and subject himself to cross-examination on a host of potentially damaging subjects.   Petitioner chose not to testify during either phase of his trial.[69]   Petitioner does not allege he was uninformed when he made the decision not to testify at either phase of his trial.   Thus, petitioner's trial counsel were left with no practical means to present or argue a "residual doubt" theory at the punishment phase of petitioner's trial. Without any credible evidence in the record upon which to base a "residual doubt" argument at the punishment phase of trial, there

---

[68] S.F. State Habeas Hearing, testimony of Michael Granados, at pp. 28-30.

[69] S.F. Trial, Volume 20, at pp. 76-78; Volume XXIII, at pp. 121-22.

is not even a remote possibility, much less a reasonable probability, of a different outcome to that portion of petitioner's trial had his trial counsel attempted to urge "residual doubt" before petitioner's capital sentencing jury.

While petitioner's argues that his trial counsel should have undertaken unspecified cross-examination of unidentified witnesses and introduced unidentified additional evidence to support a "residual doubt" argument, conclusory arguments of this nature are legally insufficient to satisfy the prejudice prong of *Strickland*. *Mallard v. Cain*, 515 F.3d 379, 383 (5th Cir. 2008); *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000), *cert. denied*, 531 U.S. 849 (2000); *Green v. Johnson*, 160 F.3d 1029, 1041 (5th Cir. 1998), *cert. denied* 525 U.S. 1174 (1999).

5.   Conclusions

The Texas Court of Criminal Appeals' rejection on the merits, during the course of petitioner's state habeas corpus proceeding, of petitioner's ineffective assistance claim complaining about his trial counsel's failure to raise a "residual doubt" defense at the punishment phase of petitioner's trial was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor the products of an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.   The state habeas court reasonably

72

concluded there was nothing objectively unreasonable with the failure of petitioner's trial counsel to urge such a defense after the jury had implicitly rejected petitioner's claim that Verstegen's death was accidental.    Furthermore, this Court independently concludes the failure of petitioner's trial counsel to raise a "residual doubt" defense at the punishment phase of trial did not "prejudice" petitioner within the meaning of *Strickland*.  Petitioner has identified no evidence in the record, or reasonably available at the time of trial, which would have furnished an evidentiary basis for a "residual doubt" argument at the punishment phase of petitioner's trial.  There is no reasonable probability that such an argument, even if urged, would have had any impact whatsoever on the outcome of the punishment phase of petitioner's trial.   The evidence of petitioner's guilt was overwhelming, as was the evidence of petitioner's long history of violent, criminal, conduct.    Petitioner's fifth ineffective assistance claim herein does not warrant federal habeas corpus relief.

E.    Failure to Investigate "Bite Marks"

    1.    The Claim

    In the text of his final ineffective assistance claim herein, petitioner argues his trial counsel should have retained the assistance of an expert to investigate whether the purported "bite marks" found on Verstegen's body could be matched to the

petitioner's teeth.[70]  Petitioner argues such an analysis might have excluded him as a possible source of the "bite mark" in question.

  2.   Lack of State Court Disposition

    a.   Lack of Exhaustion

While petitioner has attached a two-page document as Exhibit J to his federal habeas corpus petition herein, there is no file-stamp on this *undated* document or other indication on the face thereof that said document was ever properly presented to any state court.   There is nothing in any of the state court records submitted by either party to this Court indicating petitioner's *pro se* "Request for Supplemental Claim to Post Conviction, Death Penalty Case" was ever filed in petitioner's state habeas corpus proceedings.   The state habeas trial court made no reference or allusion in its Order containing its findings of fact and conclusions of law to any *pro se* supplemental claim filed by petitioner.   Thus, there is no evidence currently before this Court establishing that petitioner ever "fairly presented" the state habeas court with the complaint he now raises regarding alleged bite marks on Verstegen's body.

    b.   Petitioner's Documents

To comprehend what petitioner is complaining about regarding the purported "bite marks," it is necessary to review the unverified, unauthenticated, hearsay documents submitted to this

---

[70] Petition, at pp. 31-33.

Court by petitioner's federal habeas counsel, as well as the testimony of a pair of witnesses from petitioner's trial.

Petitioner's federal habeas counsel have submitted a copy of petitioner's purported *pro se* supplemental state habeas corpus application in which petitioner argues that he was arrested in Michigan after a bite mark found on Verstegen was matched to petitioner's teeth.[71]

Petitioner's federal habeas counsel also submitted an unauthenticated, unverified, copy of the search warrant affidavit that was admitted into evidence during petitioner's trial as State Exhibit no. 1 which states, in pertinent part, as follows:

> Affiant has been advised by Detective Saidler that on November 25, 1996, Dr. William M. Morlang D.D.S. has [sic] examined  photographs of the decedent, Susan Verstegen. Based upon Dr. Morlang's examination of marks on Ms. Verstegen's body, Dr. Morlang has reported that the marks are possibly human dental bite marks.  Dr. Morlang indicates in his report that dental cast should be obtained and compared to the injury patterns on Ms. Verstegen's body.[72]

Petitioner did not furnish this Court with a copy of Dr. Morlang's report, however.  Nor has petitioner furnished this Court with any evidence showing the marks in question on Verstegen's body were, in fact, ever determined to be human bite marks.

---

[71] *See* Exhibit J to Petition.

[72] *See* Exhibit K to Petition, at ¶8.
Another copy of this same search warrant affidavit appears at the first trial exhibit contained in S.F. Trial, Volume 25.

c.   Trial Testimony Re "Bite Marks"

During petitioner's trial, Detective Saidler testified on cross-examination by petitioner's trial counsel, in pertinent part, as follows:

> Q. Tell us about the bite marks.  What was the necessity of getting teeth impressions from Mr. Hernandez?
> A.  I believe Detectives [sic] Carrion had looked into the case and started looking at the evidence again, and one of the pictures, I believe, he saw or taken [sic] during the autopsy, somebody said, you know, that looks like a bite mark.  So, he for a hold of Dr. Morlang, I believe it was, and he looked at them also and said he would need bite mark impressions to check better and see if, in fact, it was bite marks.
> Q. Do you recall when that was done?
> A. As far as which one? I'm sorry.
> Q. When was Dr. Morlang consutled?
> A. He was first consulted by Detective Carrion.  I don't remember what year.  But then I consulted with him, also, after coming back from Michigan once I did obtain the bite marks -- the dental impressions.  I'm sorry.
> Q.  So, this was something that was developed by Detective Carrion, and this was not something that came from the autopsy?
> A. I know it was from the autopsy photos.  I don't know who brought it up to Detective Carrion, whether it was something he observed himself from looking at the photos or somebody pointing it out to him during the autopsy.[73]

On direct examination by the prosecution, Dr. Bux testified, in pertinent part, as follows:

> Q. Okay.  There has been previous testimony about bite marks.  Is there any way to tell if that's a bite mark or not.
> A.  Not really.  The problem is, you have a -- particularly in this one (indicating).  You have what looks kind of like an arc, but you've also got other things that are vertically oriented that don't go along

_____

[73] S.F. Trial, Volume 19, testimony of George Saidler, at pp. 97-98.

76

with this.  These kind of round ones and rectangular ones
kind of go with the arc, or an arc of half a bite.  But
the problem is, you don't have any -- typically, with
bite marks you can have it like this and you can have it
like that.  And that's not there, so I couldn't call it
that.[74]

3.   _De Novo_ Review

Because  no  state  court  has  ever  addressed  petitioner's
complaint regarding his trial counsel's failure to retain an expert
to analyze the purported "bite mark" on Verstegen's body or to do
a comparison between that "bite mark" and petitioner's teeth, this
court's analysis of petitioner's ineffective assistance claim is
necessarily _de novo_. _Porter v. McCollum_, ___ U.S. at ___, 130 S.Ct.
at 452; _Rompilla v. Beard_, 545 U.S. at 390, 125 S.Ct. at 2467;
_Wiggins v. Smith_, 539 U.S. at 534, 123 S.Ct. at 2542.

a.   No Deficient Performance

Absent  some  specific  factual  allegation,  or  evidence,
establishing the mark in question on Verstegen's body was, in fact,
a human bite mark, there was nothing objectively unreasonable in
the failure of petitioner's trial counsel to retain a forensic
dental  expert  to  compare  that  purported  "bite  mark"  with
petitioner's teeth.  "The defense of a criminal case is not an
undertaking in which everything not prohibited is required.  Nor
does it contemplate the employment of wholly unlimited time and

---

[74] S.F. Trial, Volume 20, testimony of Robert C. Bux, at p. 23.

resources." *Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992), *cert. denied*, 510 U.S. 829 (1993).

Petitioner's trial counsel presumably had available to them prior to trial Dr. Bux's detailed report on Verstegen's autopsy. Petitioner identifies nothing in Dr. Bux's autopsy report establishing that he found any human bite marks on Verstegen's body.  Dr. Bux testified at trial he was unable to identify the mark in question as a "bite mark," much less a human bite mark.

Petitioner has alleged no specific facts, much less furnish this Court with any evidence, showing it was objectively unreasonable for petitioner's trial counsel to have relied on Dr. Bux's autopsy report, which did not identify any human bite marks on Verstegen's body, in conducting their investigation into the prosecution's case against petitioner.  There is no evidence currently before this Court suggesting the rather cryptically referenced "bite mark" referenced in the search warrant affidavit was ever ascertained to be a human bite mark.  As best this Court can tell from that hearsay-within-hearsay document, Dr. Morlang, who was apparently reviewing Verstegen's autopsy photographs several years after the fact, did not definitely opine that any particular mark on Verstegen's body was a human bite mark. Likewise, there are no specific facts currently before this Court, much less any evidence, establishing it was physically possible as of the date of petitioner's arrest to have re-examined Verstegen's

78

body or autopsy photographs to determine conclusively whether any of the arc-shaped marks on Verstegen's body visible in the many autopsy photographs later admitted into evidence during petitioner's trial were actually human bite marks.

Petitioner's trial counsel, i.e., attorneys Trevino and Granados, did not enter the picture until 2003 at the earliest. Given the absence of (1) any prosecution evidence linking petitioner's teeth to any mark on Verstegen's body and (2) anything in Dr. Bux's autopsy report definitely identifying any of the marks on Verstegen's body as "bite marks," much as "human bite marks," there was nothing objectively unreasonable with the decision of said counsel to focus their investigation into the prosecution's case against petitioner in other areas.   The role of criminal defense counsel lies primarily in rebutting the efficacy of the prosecution's evidence, not in chasing rabbits down holes which are unlikely to lead to relevant or material evidence.  Petitioner has identified no information available at the time of petitioner's trial which would have alerted petitioner's trial counsel to the possibility that favorable, i.e., exculpatory or mitigating, evidence might be obtained through an expert comparison of petitioner's teeth to any identified mark on Verstegen's body. Petitioner alleges no specific facts showing Dr. Morlang or anyone else possessing the necessary expertise or experience ever definitely identified any human bite mark on Verstegen's body.

Petitioner has alleged no specific facts, and has presented this Court with no evidence, showing it was objectively unreasonable for petitioner's trial counsel to focus their pretrial preparation on matters other than the phantom "bite marks" which Dr. Bux could not identify as such.

   b.   <u>No Prejudice</u>

There is no evidence before this Court showing any human bite mark was ever definitely identified on Verstegen's body. There is no factual allegation, much less any evidence, now before this court showing petitioner would have benefitted in any tangible manner (through the discovery of exculpatory or mitigating evidence) from an attempted comparison of petitioner's teeth to any mark found on Verstegen's body. Petitioner has not identified any human bite mark on Verstegen's body which, as of 2003 when petitioner's trial counsel became involved in petitioner's case, was subject to discovery through examination of Verstegen's body or the photographs from her autopsy.

Under such circumstances, petitioner has failed to satisfy the prejudice prong of *Strickland*. *See Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994)(holding absent a specific, affirmative showing of precisely what evidence or testimony was rendered unavailable due to a trial counsel's failure to investigate, develop, and present same, i.e., a showing of exactly what the missing evidence or testimony would have been, a court cannot even

begin to apply the *Strickland* analysis because it is very difficult to determine whether the defendant was prejudiced by any such deficiencies in counsel's performance).

Petitioner's speculative assertion that comparison of his teeth to unidentified marks on Verstegen's body would have furnished exculpatory evidence fails to satisfy the prejudice prong of *Strickland*, in part, because petitioner has failed to allege any specific facts, much less produce any evidence, showing there was any viable means available at the time petitioner's trial counsel first came on the scene in 2003 to compare petitioner's September, 2002 dental impression with any marks found on Verstegen's body during her February, 1994 autopsy.  Moreover, the only indication in the record now before this Court regarding "bite marks" suggests Dr. Morland, looking at photographs from Verstegen's autopsy years after the fact, recommended a dental impression be obtained of possible suspects for comparison purposes.  Nothing in the cryptic search warrant affidavit currently before this Court establishes that Dr. Morland ever definitely identified any mark he saw on Verstegen's autopsy photographs as a human bite mark.  Dr. Bux did not identify any human bite marks on Verstegen's body during her autopsy.  Petitioner has furnished this Court with no affidavit from Dr. Morland or any other qualified expert establishing that any mark observed on Verstegen's body during her autopsy was produced by human teeth.

Under such circumstances, petitioner has failed to establish a reasonable probability that, but for the failure of his trial counsel to obtain an expert comparison of petitioner's teeth with any mark on Verstegen's body, the outcome of either phase of petitioner's trial would have been different.

4.   Conclusions

Petitioner's complaint about his trial counsel's failure to obtain an expert comparison of petitioner's teeth with purported bite marks on Verstegen's body fails to satisfy either prong of *Strickland* and does not warrant federal habeas corpus relief.

## IV. **Certificate of Appealability**

The AEDPA converted the "certificate of probable cause" previously required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a "Certificate of Appealability" ("CoA"). *See Hill v. Johnson*, 114 F.3d 78, 80 (5th Cir. 1997)(recognizing the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the CPC standard); *Muniz v. Johnson*, 114 F.3d 43, 45 (5th Cir. 1997)(holding the standard for obtaining a CoA is the same as for a CPC). The CoA requirement supersedes the previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA. *Robison v. Johnson*, 151 F.3d 256, 259 n.2 (5th Cir. 1998), *cert. denied*, 526 U.S. 1100 (1999); *Hallmark v. Johnson*, 118 F.3d 1073,

82

1076 (5th Cir. 1997), *cert. denied sub nom. Monroe v. Johnson*, 523
U.S. 1041 (1998).

Under the AEDPA, before a petitioner may appeal the denial of
a habeas corpus petition filed under Section 2254, the petitioner
must obtain a CoA. *Miller-El v. Johnson*, 537 U.S. 322, 335-36, 123
S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); 28 U.S.C. §2253(c)(2).
Likewise, under the AEDPA, appellate review of a habeas petition is
limited to the issues on which a CoA is granted. *See Crutcher v.
Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002)(holding a CoA is
granted on an issue-by-issue basis, thereby limiting appellate
review to those issues); *Jones v. Cain*, 227 F.3d 228, 230 n.2 (5th
Cir. 2000)(holding the same); *Lackey v. Johnson*, 116 F.3d 149, 151
(5th Cir. 1997)(holding the scope of appellate review of denial of
a habeas petition limited to the issues on which CoA has been
granted). In other words, a CoA is granted or denied on an issue-
by-issue basis, thereby limiting appellate review to those issues
on which CoA is granted alone. *Crutcher v. Cockrell*, 301 F.3d at
658 n.10; *Lackey v. Johnson*, 116 F.3d at 151; *Hill v. Johnson*, 114
F.3d at 80; *Muniz v. Johnson*, 114 F.3d at 45; *Murphy v. Johnson*,
110 F.3d 10, 11 n.1 (5th Cir. 1997); 28 U.S.C. §2253(c)(3).

A CoA will not be granted unless the petitioner makes a
substantial showing of the denial of a constitutional right.
*Tennard v. Dretke*, 542 U.S. 274, 282, 124 S.Ct. 2562, 2569, 159
L.Ed.2d 384 (2004); *Miller-El v. Johnson*, 537 U.S. at 336, 123

S.Ct. at 1039; *Slack v. McDaniel*, 529 U.S. 473, 483, 120 S.Ct. 1595, 1603, 146 L.Ed.2d 542 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983).

To make such a showing, the petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke*, 542 U.S. at 282, 124 S.Ct. at 2569; *Miller-El v. Johnson*, 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604; *Barefoot v. Estelle*, 463 U.S. at 893 n.4, 103 S.Ct. at 3394 n.4. This Court is required to issue or deny a CoA when it enters a final Order such as this one adverse to a federal habeas petitioner. *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts.*

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. If this Court rejects a prisoner's constitutional claim on the merits, the petitioner must demonstrate reasonable jurists could find the court's assessment of the constitutional claim to be debatable or wrong. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner

must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Johnson*, 537 U.S. at 338, 123 S.Ct. at 1040 (quoting *Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604). *Accord Tennard v. Dretke*, 542 U.S. at 282, 124 S.Ct. at 2569. In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *See Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Foster v. Quarterman*, 466 F.3d at 364; *Dickson v. Quarterman*, 462 F.3d 470, 476 (5th Cir. 2006); *Pippin v. Dretke*, 434 F.3d at 787; *Bridgers v. Dretke*, 431 F.3d 853, 861 (5th Cir. 2005), *cert. denied*, 548 U.S. 909 (2006).

85

Nonetheless, a CoA is not automatically granted in every death penalty habeas case. *See Sonnier v. Quarterman*, 476 F.3d at 364-69 (denying CoA on a wide variety of challenges to the Texas capital sentencing scheme, including some similar to petitioner's seventh and eighth claims herein).

None of petitioner's claims herein satisfy the standard for obtaining a CoA. Because petitioner has failed to present this Court with any evidence establishing precisely what testimony he would have given had he been called to testify during his suppression hearing, petitioner's complaints about the performance of his trial counsel during petitioner's suppression hearing satisfy neither prong of *Strickland*. Petitioner's complaints about his trial counsel's failure to object to allegedly improper prosecutorial questions and argument regarding Dr. Bux's testimony as to the precise method of Verstegen's strangulation are premised upon erroneous constructions of Dr. Bux's testimony (which the prosecution's closing argument described accurately) and a fundamental misunderstanding of the crux of the prosecutor's question about which petitioner now complains. Furthermore, there is not even a remote possibility either of the objections petitioner now argues should have been made to the prosecutor's argument and question to Dr. Bux would have had any impact whatsoever on the outcome of either phase of petitioner's capital murder trial.

86

Petitioner's complaint about his trial counsel's failure to argue residual doubt at the punishment phase of petitioner's trial is so woefully lacking in arguable merit it borders on the legally frivolous. Petitioner confessed in writing to a brutal crime and his confession was substantiated by DNA evidence linking him to the sexual assault of Verstegen. The nature of Verstegen's death, i.e., strangulation by either hands, a ligature, or a combination of both, required petitioner to have continued strangling her more than 100 seconds after she became unconscious. In sum, there was no residual doubt available to argue to the jury at the punishment phase of petitioner's trial.

Petitioner's failure to allege any specific facts showing how he would have benefitted from a comparison of his teeth with any identified mark on Verstegen's body fails because petitioner has shown no factual or evidentiary basis exists for believing any of the marks on Verstegen's body were the product of a bite by human teeth. Moreover, petitioner has not shown it was even scientifically possible to conduct such a comparison in of 2003, almost a decade after Verstegen's autopsy.

Reasonable jurists could not disagree over any of this court's independent findings of "no prejudice" to support petitioner's various *Strickland* claims. There is no room for disagreement among reasonable jurists over the eminently reasonable nature of the state habeas court's rejections on the merits of most of

petitioner's ineffective assistance claims herein based upon petitioner's failure to satisfy the deficient performance prong of *Strickland*. Petitioner is not entitled to a CoA for the purpose of re-arguing claims which he utterly failed to support with any evidence during his state habeas proceeding or which he has failed to support with evidence in this Court. Therefore, petitioner is not entitled to a Certificate of Appealability in this cause.

Accordingly, it is hereby **ORDERED** that:

1.    All relief requested in petitioner's federal habeas corpus petition, filed April 22, 2009, docket entry no. 15, is **DENIED.**

2.    Petitioner is **DENIED** a Certificate of Appealability.

3.    All other pending motions are **DISMISSED AS MOOT**.

4.    The Clerk shall prepare and enter a Judgment in conformity with this Memorandum Opinion and Order.

**SIGNED and ENTERED this ___25___ day of February, 2010.**

                                             _____
                                             **ORLANDO L. GARCIA**
                                             **United States District Judge**